Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>    Peticionario<br><br><br>           v.<br><br><br>Chrisantoni Guerrido López<br><br>    Recurrido | Certiorari<br><br>2010 TSPR 205<br><br>179 DPR ____ |

Número del Caso: CC-2007-776

Fecha: 23 de septiembre de 2010

Tribunal de Apelaciones:

        Región Judicial de Bayamón Panel VI

Juez Ponente:     Hon. Luis Rivera Román

Oficina del Procurador General:

        Lcda. Marta E. Ortiz Camacho
        Procuradora General Auxiliar

Abogada de la Parte Recurrida:

        Lcda. Ana Rosa Montes Arraiza

Materia: Admisibilidad de Análisis químico al Amparo de la Regla 65(h) de evidencia

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>     Peticionario<br><br>          v.<br><br>Chrisantoni Guerrido López<br><br>     Recurrido | CC-2007-776 | Certiorari |

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico a, 23 de septiembre de 2010.

> *Puede decirse que quien objeta al testimonio de un testigo, invocando prueba de referencia, lo que hace es invocar falta de conocimiento personal del testigo sobre la materia o asunto en controversia,* **y falta de confrontación con el tercero que hace la declaración.**[1]
> (Énfasis suplido.)

El presente caso nos permite pautar si un informe químico es admisible como evidencia sustantiva contra un acusado cuando el técnico que preparó dicho informe no comparece como testigo en el juicio al momento que se solicita su admisión, y cuando el acusado no tuvo la oportunidad de contrainterrogar a ese testigo previamente, con relación a ese informe.

---

[1] E.L. Chiesa, Tratado de Derecho Probatorio, Tomo II, Ed. Corripio, pág. 352, (1998).

Como lo intima el profesor Chiesa Aponte en la cita con que iniciamos, es evidente que existe una relación estrecha entre el derecho a confrontación que ampara a un acusado y la llamada regla de exclusión de prueba de referencia establecida en nuestras Reglas de Evidencia. Cada una de estas disposiciones, tanto la Cláusula de Confrontación como la regla de exclusión de prueba de referencia, buscan solucionar el mismo problema: la debilidad testimonial que representa evidencia de segunda mano.[2]

## I

Los hechos procesales pertinentes que motivaron el recurso que nos ocupa son los siguientes: el recurrido Chrisantony Guerrido López fue acusado de dos violaciones al Art. 404 de la Ley de Sustancias Controladas[3], específicamente, posesión de cocaína y marihuana. Llegado el momento del juicio en su fondo y una vez testificó el agente que incautó e hizo las prueba de campo de las sustancias por la cual se le imputa al acusado la posesión de cocaína y marihuana, el Ministerio Público intentó someter en evidencia el informe de la químico que realizó los análisis a las sustancias, como evidencia de uno de los elementos de los delitos imputados.

---

[2] Koley James L., *Today's Confrontation Clause (After Crawford and Melendez- Díaz)*, 43 Creighton L. Rev. 35, pág. 3, 2009.

[3] Ley Núm. 4 de 23 de junio de 1971, 24 L.P.R.A. sec. 2404.

Ahora bien, la controversia surge cuando el ofrecimiento de tal informe se hace en ausencia durante la vista –y aparente no disponibilidad– de la perito químico del Instituto de Ciencias Forenses (ICF) que, a solicitud del propio Estado, realizó las pruebas y análisis de las referidas sustancias.

Lo acontecido procesalmente, conforme surge del récord, fue lo siguiente: durante el primer señalamiento del caso el Ministerio Público anunció al Tribunal que utilizaría el testimonio de la Químico Isabel González. No obstante, el día de la vista en su fondo la químico González se encontraba de vacaciones por lo que el Director del (ICF) envió a otra químico, la Sra. Carmen Calcaño, en sustitución de González.

Así las cosas, la Fiscal de sala llama a testificar a la químico Calcaño quien testifica con relación a los protocolos que se siguen en este tipo de caso y los procedimientos que realizó su compañera. En ningún momento –y ante esta nueva realidad procesal– la Fiscal solicitó la sustitución de la químico anunciada previamente, ni formuló pregunta alguna durante su interrogatorio directo a la químico Calcaño para aclarar o justificar la razón por la cuál la químico González no se encontraba en sala. O sea, **durante su interrogatorio directo el Ministerio Público nunca justificó la no disponibilidad de la químico González, sino que pretendió presentar a una persona distinta a la anunciada, sin**

**otorgar explicación alguna al Tribunal**. No fue sino hasta que, finalizado el interrogatorio directo, el Juez preguntó y la fiscal indicó que la químico previamente anunciada se encontraba de vacaciones.

En ese momento el acusado levanta objeción a la admisión del informe preparado por la químico González fundamentándose básicamente en que éste constituía prueba de referencia y que su admisión como prueba sustantiva, en ausencia del perito químico que lo suscribió, constituía una violación a su derecho constitucional a carearse con el testigo. Ante tal planteamiento, y con la oportuna réplica del Ministerio Público, el Tribunal de Primera Instancia declaró con lugar la objeción y no permitió la admisión del informe, señalando que "la Químico que compareció no es la Químico que hizo el análisis."

De ese dictamen el Ministerio Público recurre al Tribunal de Apelaciones en una solicitud de *Certiorari*, argumentando, *inter alia*, que de conformidad con la Regla 65(H) de las de Evidencia, *infra*, el informe en cuestión era admisible como excepción a la regla de exclusión de prueba de referencia, pues tal regla no requiere la no disponibilidad del testigo declarante para la admisión de su declaración.[4] El tribunal apelativo intermedio confirmó

---

[4] La Regla 1201 de las nuevas Reglas de Evidencia de Puerto Rico aprobadas en 2009, señala que éstas aplicarán a todo juicio iniciado con posterioridad al 1 de enero de 2010. Por lo tanto, las Reglas de Evidencia en vigor para la fecha del inicio del caso de autos eran las anteriores Reglas de Evidencia de 1979.

el tribunal de instancia, fundamentándose en que el Ministerio Público no había logrado probar la no disponibilidad del perito químico. Con el beneficio de la posición de ambas partes, resolvemos.

## II

### *La Cláusula de Confrontación*
### *bajo la Constitución de Puerto Rico*

La palabra "confrontar" encuentra su raíz etimológica en los vocablos provenientes del latín *"cum"* que significa "con" y *"frontis"* que significa "frente", siendo su significado: "careo entre dos o más personas".[5] En su concepto más básico o fundamental, el derecho a la confrontación se define como el derecho de un acusado a confrontar a sus acusadores.[6] Tal derecho a la confrontación o al "careo" encuentra su génesis en el derecho romano desde la Segunda Etapa Clásica de la historia romana (30 a.C. al 130 d.C.).[7] Incluso, el Libro de los Hechos de los Apóstoles nos muestra cómo, en la exposición de Festo ante el Rey Agripa abogando por el Apóstol Pablo, el primero invoca el derecho del apóstol

---

[5] Real Academia Española, <u>Diccionario de la Lengua Española</u>, 622 (XXI ed., 2001).

[6] *Gatell v. MacLeod*, 56 D.P.R. 119, 125 (1940).

[7] R. Cortés Moreno, <u>Un análisis del derecho a confrontación puertorriqueño y la constitucionalidad de las Reglas 37 y 39 de Evidencia según enmendadas por la Ley 42 del 7 de junio de 1988</u>, 37 Rev. D.P. 25 (1998).

-quien ostentaba ciudadanía romana- a confrontarse con sus acusadores.[8]

El Art. 2 de la Carta Orgánica de 1917 disponía que "[e]n todos los procesos criminales el acusado gozará del derecho... de carearse con los testigos de cargo...".[9] Esa misma garantía fue incluida por la Asamblea Constituyente en el Art. 11 de la Constitución de Puerto Rico, vigente desde el 25 de julio de 1952, la cual dispone de igual forma que en todos los procesos criminales, "el acusado disfrutará del derecho... a carearse con los testigos de cargo, a obtener la comparecencia compulsoria de testigos a su favor".[10]  Como se señala en la nota al calce número 3 de *Pueblo v. Vargas*, 74 D.P.R. 144, 147 (1952):

> Las razones para retener el precepto fueron resumidas por la Comisión de Carta de Derechos en su informe a la Convención Constituyente, con las siguientes palabras: 'La garantía de confrontarse con los testigos contrarios es esencial en el sistema nuestro. Nuestro Tribunal Supremo ha aceptado en este campo las doctrinas del

---

[8] El texto dice así:
> Pasados algunos días, el rey Agripa y Berenice vinieron a Cesarea para saludar a Festo. Y como estuvieron allí muchos días, Festo expuso al rey la causa de Pablo, diciendo: Un hombre ha sido dejado preso por Félix, respecto al cual, cuando fui a Jerusalén, se me presentaron los principales sacerdotes y los ancianos de los judíos, pidiendo condenación contra él.
> **A éstos respondí que no es costumbre de los romanos entregar alguno a la muerte antes que el acusado tenga delante a sus acusadores, y pueda defenderse de la acusación**. (Énfasis suplido.)

> Libro Hechos de los Apóstoles Cap. 25, vers. 13-19. Biblia Plenitud, Versión Reina Valera, 1960, Grupo Nelso (2008), pág. 1435.

[9] Art. 2, 1 L.P.R.A. Sec. 2.

[10] Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1.

> derecho común.  El propósito es impedir que
> se utilicen en contra de un acusado
> declaraciones que no se han sometido a la
> prueba del contrainterrogatorio.  Las
> excepciones que se reconocen a la 'regla de
> la prueba de referencia' –– en virtud de las
> cuales se admiten declaraciones de valor
> especial, a pesar de que no se han sometido
> a contrainterrogatorio en el juicio en que
> se ofrecen––presentan problemas de
> legislación y administración judicial, que
> no deben afectar la formulación de la norma
> aquí recomendada."

A través de todos estos años, el derecho a la confrontación se ha reconocido en diversas circunstancias en nuestra jurisdicción. Así, hemos expresado que el derecho a contrainterrogar un testigo es uno fundamental en la celebración de un juicio justo e imparcial, siendo el medio que tiene la defensa del acusado para descubrir la verdad.  Por lo tanto, privarlo de ese derecho en relación con uno de los ingredientes principales en la comisión de un delito constituye un error que conlleva la revocación de la sentencia.[11]

Hemos dicho que para que la confrontación o careo que garantiza nuestra Constitución tenga concreción y sentido, el debido proceso de ley exige que se pongan al alcance del acusado los medios de prueba para impugnar los testigos, atacar su credibilidad y todo recurso análogo encaminado a erradicar la falsedad del juicio y evitar el desvío de la justicia.  Un careo sin estos instrumentos, cuando sean legítimamente asequibles,

---

[11] *Pueblo v. Pacheco Padilla*, 92 D.P.R. 894(1965).

frustra el propósito del precepto constitucional.[12]   En *Pueblo v. Ríos Nogueras*, 114 D.P.R. 256, 264 (1983), señalamos que "[n]o debe olvidarse que en casos criminales el derecho a la confrontación es garantía insustituible".

Ahora bien, el derecho a la confrontación es uno renunciable. Tal renuncia puede darse implícitamente si el acusado deja de comparecer al juicio, a sabiendas de que puede ser juzgado en su ausencia.[13] También un acusado puede renunciar a su derecho a contrainterrogar a un testigo de cargo a través de la estrategia legal de su abogado.[14]

Por último, no debemos pasar por alto que tanto la Sexta Enmienda federal, *supra*, como la Cláusula de Confrontación de la Constitución de Puerto Rico, *supra*, establecen el derecho de todo acusado "a obtener la comparecencia compulsoria de testigos a su favor".   En ese contexto, en *Pueblo v. Acosta Escobar*, 101 D.P.R. 886, 889 (1974), reconocimos que

> [e]l derecho de todo acusado a obtener la comparecencia compulsoria de testigos a su favor está también garantizado por la Constitución federal en su Enmienda Sexta, y se ha reconocido que es un derecho de naturaleza fundamental y obligatorio para los estados. Ese derecho no está limitado a determinada etapa del juicio.  Es deseable

---

[12] *Pueblo v. Rodríguez Sánchez*, 109 D.P.R. 243  (1979).

[13] *Pueblo v. Ortiz*, 57 D.P.R. 469 (1940); *Pueblo v. Carbone* 59 D.P.R. 610 (1941).

[14] *Pueblo v. Vargas*, 74 D.P.R. 144 (1952).

que la solicitud para que se ordene la citación de testigos se haga antes del juicio.

## III

La Regla 65(H) de las Reglas de Evidencia de 1979 disponía lo siguiente:

Es admisible como excepción a la regla de prueba de referencia aunque el declarante esté disponible como testigo:

...

(H) *Récords e informes oficiales.* Evidencia de un escrito hecho como récord o informe de un acto, condición o evento, cuando se ofrece para probar el acto, condición o evento, si el escrito fue hecho en o cerca del momento del acto, condición o evento, por y dentro del ámbito del deber de un empleado público, siempre que las fuentes de información y el método y momento de preparación fueran tales que indican su confiabilidad.

La Regla 65(H) formaba parte de más de veinte excepciones a la regla de exclusión de prueba de referencia de las Reglas de Evidencia de 1979, *supra*, para las que no se exigía la no disponibilidad del testigo declarante. Esto sugiere que "estas declaraciones tengan más garantías de confiabilidad que aquellas condicionadas a la no disponibilidad, pues ahora se prescinde del factor necesidad y las excepciones se fundan únicamente en la confiabilidad intrínseca de las declaraciones.[15]

Hasta ahora, lo importante bajo la Regla 65(H), según señala el profesor Chiesa Aponte, era "la admisión del

---

[15] E.L. Chiesa, <u>Tratado de Derecho Probatorio</u>, *op. cit.*, pág. 763.

récord oficial, independientemente de que el declarante [estuviera] disponible para testificar, o de si alguien [testificara] sobre el récord, o de si hubo alguna evidencia independiente de corroboración."[16] Esta regla fue copiada de la Sección 1280 del Código de Evidencia de California en un claro rechazo a la Regla Federal 803(8), para aprobar una regla que fuera más liberal.[17]

De manera que el texto de la Regla 65(H) de la Reglas de Evidencia de 1979, *supra*, permite, como se permitía en la jurisdicción californiana bajo la Sección 1280 del Código de Evidencia de California, la admisión de documentos, expedientes o récords públicos como prueba sustantiva aun estando disponibles los testigos, siempre y cuando se cumpliera con las condiciones que establece la propia regla, las cuales son: que el escrito "fue hecho en o cerca del momento del acto, condición o evento, por y dentro del ámbito del deber de un empleado público, siempre que las fuentes de información y el método y momento de preparación fueran tales que indican su confiabilidad".[18]

---

[16] *Íd.*, pág. 841.

[17] Es de notar que, en la Conferencia Judicial de 1978, que sirvió de marco para la aprobación de las Reglas de Evidencia de 1979 por parte de este Tribunal Supremo, se rechazó el Código de Evidencia de California como modelo, en favor de las Reglas Federales de Evidencia.

[18] Véase *Pueblo v. Mattei Torres*, 121 D.P.R. 600, 616-618 (1988), donde se cita *in extenso* al profesor Chiesa Aponte con relación a esta regla.

Por último, es menester apuntalar lo expresado en *Pueblo v. Mattei Torres*, 121 D.P.R. 600, 617 (1988), en donde, citando con aprobación al profesor Chiesa Aponte, señalamos lo siguiente:

> Las limitaciones impuestas por las reglas federales en casos criminales no son aplicables, de suyo, en Puerto Rico, **salvo en cuanto ello sea una exigencia del derecho a confrontación bajo la 6[t]a enmienda.** (Énfasis suplido.)

Ahora bien, la Regla 65(H) de las Reglas de Evidencia de 1979, fue sustituida por la actual Regla 805 (H) de las nuevas Reglas de Evidencia de Puerto Rico de 2007, alterando su contenido sustancialmente. La nueva Regla 805 (H) sí adopta el contenido de la regla federal 803(8) estableciendo un enfoque más restrictivo en favor del acusado.[19] Para completar el marco en lo relacionado a este tema es extremadamente pertinente citar nuevamente al profesor Chiesa Aponte en cuanto al alcance de la nueva Regla 805(H):

> Ante... la norma constitucional establecida por la Corte Suprema en *Crawford*, [*Crawford v. Washington, infra*] se optó por adoptar la regla federal que protege al acusado contra todo tipo de informe *"por investigación"*. Para la exclusión de esos tipos de informes como prueba de cargo, [en nuestra jurisdicción] no hay ya que recurrir a la cláusula de confrontación sino que se trata

---

[19] Véase Informe de las Reglas de Derecho Probatorio de 2007 del Secretariado de la Conferencia Judicial y Notarial, pág. 548.

de prueba de referencia inadmisible, de conformidad con la propia Regla 805(H).[20]

## IV

### *El Caso de Crawford v. Washington, infra, y su progenie:*

En el año 2004, el Tribunal Supremo Federal emitió una decisión que cambió sustancialmente la forma en que se había venido interpretando la Cláusula de Confrontación de la Sexta Enmienda de la Constitución federal. Iniciando con *Crawford v. Washington*, 541 U.S. 36 (2004), el Tribunal Supremo Federal disolvió el maridaje que en ciertas circunstancias había permitido entre la Cláusula de Confrontación y las excepciones a la regla de exclusión de prueba de referencia, situación que había consentido desde *Ohio v. Roberts*, 448 U.S. 56 (1980).

A partir de estas nuevas decisiones, el más Alto Foro federal ha establecido – aunque por el propio análisis del Tribunal sería correcto decir que "ha re-establecido"– las garantías mínimas que cobijan a todo ciudadano a la luz de la Cláusula de Confrontación de la Sexta Enmienda de la Constitución federal, frente a las distintas excepciones a la regla de exclusión de prueba de referencia.

Como veremos, *Crawford v. Washington*, *supra*, y su progenie, constituyen jurisprudencia normativa para nuestra jurisdicción. Esto porque la cláusula de

---

[20] E.L. Chiesa, Reglas de Evidencia de Puerto Rico 2009, Publicaciones JTS, pág. 352 (2009).

confrontación inmersa en la Sexta Enmienda de la Constitución de Estados Unidos aplica a Puerto Rico.[21]

Claro está, en el marco de la protección que brinda la Cláusula de Confrontación a un ciudadano y como un derecho fundamental, el alcance de lo resuelto por el Tribunal Supremo de los Estados Unidos tanto en *Crawford v. Washington*, *supra*, como en los casos posteriores, constituyen "el mínimo de protección que estamos obligados a reconocer bajo nuestra propia Constitución"[22], es decir,

---

[21] Como señalamos en *Pueblo v. Vargas*, 74 D.P.R. 144, supra, 147-148, (1952), al referirnos a la Ley Orgánica Jones de 1917, cuya cláusula de confrontación encuentra su precedente inmediato en la Sexta Enmienda de la Constitución federal, "[s]e trata, pues, de la adopción de una parte fundamental de la Carta de Derechos de la Ley Suprema nacional que debe recibir una interpretación similar en su aplicación local". 5 Wigmore on Evidence, sección 1397, pág. 127. Este ha sido el mismo principio de interpretación constitucional que, bajo circunstancias similares, se ha adoptado en casi todas las jurisdicciones de los Estados Unidos.

Así mismo lo ha interpretado el Tribunal Federal de Apelaciones para el Primer Circuito de Boston, incluso desde antes que se adoptara nuestra Constitución, al señalar que "[w]hen Congress by the Organic Act enacted for Puerto Rico provisions similar to those contained in our 'Bill of Rights' it intended them to have the same purport as the like provisions of our Constitution". *South Porto Rico Sugar Co. v. Buscaglia*, 154 F.2d 96, 100 (1st Cir. 1944).

También, en *Ballester-Ripoll v. Court of Tax Appeals of Puerto Rico,* 142 F.2d 11, 18 (1st Cir. 1944), se señaló lo siguiente:

> When Congress came to enact the section entitled 'Bill of Rights' of the Organic Act of Puerto Rico, as in the similar section of the Phillipine Organic Act, it incorporated the Bill of Rights of our Constitution with little alteration.
>
> As the Supreme Court said in discussing another provision in the corresponding Bill of Rights for the Phillipine Islands:'How can it be successfully maintained that these expressions of fundamental rights, which have been the subject of frequent adjudications in the courts of this country, and the maintenance of which has been ever deemed essential to our government, could be used by Congress in any other sense than that which has been placed upon them in construing the instrument from which they were taken?

[22] *Pueblo v. Casanova*, 161 D.P.R. 183, 205 (2004), Voto de Conformidad del Juez Asociado Rivera Pérez. Véase también: *Pueblo v. Meléndez Rodríguez*, 136 D.P.R. 587 (1994); *Pueblo v. Rivera Colón*, 128 D.P.R. 672 (1991); *Pueblo v. Malavé González*, 120 D.P.R. 470 (1988); *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986); *Pueblo v. Dolce*, 105 D.P.R. 422 (1976).

bajo nuestra Cláusula de Confrontación local. Como bien lo

explica el profesor Chiesa Aponte:

> En cualquier caso, las garantías fundamentales que otorga la Constitución Federal se aplican a Puerto Rico. La debatida, y debatible, naturaleza del Estado Libre Asociado no ha sido impedimento. Si el E.L.A. es considerado como un "Estado", entonces los derechos fundamentales de la Carta de Derechos se aplican a Puerto Rico a través de la Enmienda Decimocuarta (cláusula del debido proceso de ley). Por el contrario, si el E.L.A. no tiene tal estatus, entonces hay que invocar la cláusula del debido proceso de ley en la enmienda Quinta o la aplicación directa de la garantía constitucional federal, y cabe hablar, más bien, de incorporación "territorial".[23]

Pasemos entonces a considerar lo establecido en estos

importantes casos.

### *Crawford v. Washington*, 541 U.S. 36 (2004):

El 5 agosto de 1999, el Sr. Kenneth Lee fue apuñalado

en su apartamento, hechos por los cuales un poco más tarde

en la noche la Policía arrestó al Sr. Michael D. Crawford.

Después de haberle hecho tanto a Crawford como a su esposa

Sylvia las debidas advertencias –"Miranda Warnings"–, los

detectives los interrogaron, interrogatorios que fueron

grabados. Crawford eventualmente admitió que él y su

esposa Sylvia habían acudido a buscar al Sr. Lee a su

apartamento para pedirle cuentas con relación a un

---

[23] E.L. Chiesa, <u>Derecho Procesal Penal de Puerto Rico y los Estados</u>, Colombia, Tercer Mundo Editores, 1991, Vol. 1, Sec. 1.1, a la pág. 37.

incidente previo en el cual alegadamente Lee había tratado de violar a Sylvia. Estando todos en el apartamento se inició una pelea entre Crawford y Lee, saliendo este último herido de una puñalada en el torso y Crawford con una herida en la mano.

Durante el interrogatorio, y a preguntas de si durante la pelea él había visto algo en las manos del Sr. Lee, Crawford señaló que podía jurar que había visto a Lee "ir por algo" justo antes de que todo aconteciera. Sin embargo, señaló que su mente se le iba en blanco cuando "cosas como [esas] pasaban", pero que pensaba que Lee había sacado algo y que él había intentado sujetarlo, razón por la cual se había cortado la mano.

En su interrogatorio, Sylvia Crawford corroboró gran parte de la historia de su esposo. Sin embargo, a preguntas del agente investigador con relación a si había visto a Lee con algo en sus manos, ésta señaló que en medio de la pelea había visto a Lee meter su mano en el bolsillo derecho y dar un paso atrás; acto seguido Crawford lo apuñaló. Luego, esto es, inmediatamente después de Lee haber recibido la puñalada, Sylvia no vio nada en las manos de éste.

Por estos hechos Crawford fue acusado de agresión e intento de asesinato. En el juicio por jurado, Crawford levantó como teoría a su favor la legítima defensa. Basado en el privilegio "marido-mujer", Sylvia no

testificó en el juicio.[24] No obstante, el Ministerio Público intentó introducir, fundamentado en que la ofrecida era una declaración contra interés admisible como excepción a la prueba de referencia, la grabación de la declaración de Sylvia Crawford como evidencia de que la puñalada que le propinó el acusado Crawford a su víctima no había sido en defensa propia.

Crawford se opuso a la presentación de tal evidencia argumentando fundamentalmente que, sin importar si tales declaraciones cumplían o no con la excepción a la prueba de referencia, su admisión constituía una violación a su derecho bajo la Cláusula de Confrontación de la Sexta Enmienda de la Constitución federal.

No empece a la oposición levantada por Crawford, y fundamentado en lo resuelto en *Ohio v. Roberts, supra*, el tribunal de instancia permitió que el jurado escuchara la grabación de las declaraciones de Sylvia Crawford, e incluso que el Ministerio Público hiciera referencia a éstas en su argumentación de cierre, señalando que era evidencia concluyente que refutaba completamente la teoría de la legítima defensa. El jurado declaró culpable a Crawford de agresión y éste apeló el veredicto.

---

[24] Distinto a la Regla 27 de las Reglas de Evidencia de 1979, así como la Regla 509 de nuestras nuevas Reglas de Evidencia de 2009, en el estado de Washington, todavía un cónyuge puede ser impedido por el cónyuge que está siendo enjuiciado, a testificar en su contra. Sin embargo, en el estado de Washington este privilegio no se extiende a aquellas declaraciones hechas fuera del tribunal ("out-of-court statements") que puedan ser admisibles bajo alguna excepción a la prueba de referencia. Véase Wash. Rev. Code Sec. 5.60.060(1) (2009).

La Corte de Apelaciones de Washington revocó la decisión del tribunal de instancia por haber permitido que el jurado considerara las declaraciones de la Sra. Crawford. La Corte de Apelaciones fundamentó su decisión en que no se habían cumplido los requisitos (*"test"*) de *Ohio v. Roberts*, *supra*, para que una declaración que constituía una excepción a la prueba de referencia superara a su vez el escrutinio de la Cláusula de Confrontación de la Sexta Enmienda, *supra*.

No obstante, el Tribunal Supremo de Washington, basado en que sí se habían cumplido con los requisitos de *Ohio v. Roberts*, *supra*, revocó a la Corte de Apelaciones y reinstaló la convicción de Crawford. Finalmente, el Tribunal Supremo federal revocó al Tribunal Supremo de Washington, revocando en parte el caso de *Ohio v. Roberts* al concluir que lo resuelto en ese caso violaba, bajo ciertas circunstancias, el derecho de un acusado bajo la Cláusula de Confrontación de la Sexta Enmienda.[25]

---

[25] Los hechos de *Ohio v.* Roberts, *supra*, son los siguientes: el Sr. Herschel Roberts había sido acusado de falsificación de cheques y posesión de unas tarjetas de crédito robadas. Roberts alegaba que él había utilizado los cheques y las tarjetas de crédito con el permiso dado por la hija de los dueños de estos cheques y de las tarjetas de crédito. Durante la vista preliminar el abogado de Roberts llamó como único testigo de la defensa a la hija de las víctimas quien, en el interrogatorio directo, señaló que ella había permitido que Roberts utilizara su apartamento. Sin embargo y a pesar de lo largo del interrogatorio directo del abogado de la defensa, la testigo negó que le hubiera dado la libreta de cheques y las tarjetas de crédito a Roberts con el entendido de que éste podía usarlas.

Durante el subsiguiente juicio por jurado, Roberts testificó que él había utilizado los cheques y las tarjetas porque la hija de los dueños se lo había permitido. Pese a las múltiples citaciones (*"subpoenas"*) esta testigo no compareció al juicio en su fondo. Ante

Concretamente, el Tribunal Supremo federal sostuvo que la admisión de las declaraciones de Sylvia Crawford en contra de su esposo, eran **testimoniales** y, como tal, constituían prueba de referencia que violaba la Cláusula de Confrontación de la Sexta Enmienda, pues el acusado no había tenido la oportunidad de contrainterrogarla al momento en que se expresaron. **De manera que, a partir de _Crawford v. Washington_, _supra_, págs. 60, 68, una declaración testimonial hecha por un testigo fuera del tribunal (_"out-of-court statement"_) no es admisible en contra de un acusado, a menos que tal testigo no esté disponible en el juicio y el acusado haya tenido la**

---

la ausencia de la testigo, el Ministerio Público utilizó la transcripción del testimonio de ésta en la vista preliminar, como prueba de refutación. Roberts objetó tal evidencia alegando que violaba su derecho a la confrontación bajo la Sexta Enmienda. Después de cerciorarse que la testigo realmente no estaba disponible y con la objeción de Roberts, el tribunal admitió la transcripción del testimonio.

El Tribunal de Apelaciones revocó al de Primera Instancia señalando que el Ministerio Público no había realizado esfuerzos de buena fe para conseguir la testigo. El Tribunal Supremo de Ohio confirmó la decisión del Tribunal de Apelaciones pero por el fundamento de que la transcripción de la testigo era inadmisible porque la mera oportunidad de contrainterrogar a un testigo en una vista preliminar no cumple con el derecho a confrontación constitucional para propósitos del juicio.

En _Certiorari_, el Tribunal Supremo federal revocó la decisión del Tribunal Supremo de Ohio y sostuvo que el derecho de un acusado a confrontarse con los testigos de cargo bajo la Sexta Enmienda de la Constitución federal no impedía la admisión en el juicio en su contra de la declaración de un testigo no disponible, si tal declaración contenía suficientes indicios de confiabilidad ("adequate 'indicia of reliabillity'"), significando con esto que se encontraba bajo una excepción a la prueba de referencia firmemente arraigada (_"firmly rooted"_) o que la declaración tenía suficientes indicios de confiabilidad según las circunstancias, esto es, garantías particularizadas de confiabilidad (_"particularized guarantees of trustworthiness"_).

**oportunidad de contrainterrogarlo acerca de esas declaraciones, sin importar si éstas son o no confiables.**[26]

Así, en *Crawford v. Washington*, *supra*, el Tribunal Supremo concluye que la meta de la Cláusula de Confrontación de la Sexta Enmienda es asegurar la confiabilidad ("reliability") de la evidencia que se presenta contra un acusado. Pero, cuando esa evidencia es una **testimonial**, esa meta, más que sustantiva, es una garantía procesal. En ese sentido el Tribunal Supremo federal señala, con relación a esa garantía, que "[i]t commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination".[27]

Ahora bien, debemos advertir que a partir de *Crawford v. Washington*, *supra*, la Cláusula de Confrontación federal sólo se activa en relación con **declaraciones testimoniales**.[28] Así lo señala el Tribunal Supremo federal al definir el concepto "testigos" de la Cláusula de Confrontación de la Sexta Enmienda de la Constitución de

---

[26] Véase también: *United States v. Cruz-Diaz*, 550 F.3d 169, (1st Cir. 2008); *United States v. De La Cruz*, 514 F.3d 121, (1st Cir. 2008).

[27] *Crawford v. Washington*, 541 U.S. 36, 61.

[28] E.L. Chiesa Aponte, El Tribunal Supremo de Puerto Rico: Análisis del Término 2007-2008: Derecho Penal, 78 Rev. Jur. U.P.R. 291 (2009); T. Lininger, Reconceptualizing Confrontation after Davis, 85 Tex.L.Rev. 271 (2006), pág. 280.

Estados Unidos, *supra* -el cual es similar al de nuestra Cláusula de Confrontación, *supra*-:

> The text of the *Confrontation Clause* ...applies to "witnesses" against the accused--in other words, those who "bear testimony." ... An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The...constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.[29] (Citas omitidas.)

De esta forma *Crawford v. Washington*, *supra*, no sólo define lo que es un testigo para efectos de la Cláusula de Confrontación, sino que establece que esta definición aplica tanto para testimonios en corte como fuera del tribunal ("out-of-court statements"). Es importante señalar, no obstante, que *Crawford* no prohíbe la admisión de aquellas declaraciones hechas fuera del tribunal (out-of-court statements) si la intención no es probar la verdad de lo aseverado.[30] Además, tampoco prohíbe la admisión de una declaración anterior de un declarante, si el mismo se encuentra disponible para ser contrainterrogado durante la vista.[31]

---

[29] *Crawford v. Washington*, *Supra,* pág. 51 (2004).

[30] Véase *Tennessee vs.* Street, 471 U.S. 409, 105 S.Ct. 2078, 85 L.ED.2d 425 (1985)(citado con aprobación en la nota al calce número 9 de *Crawford v. Washington*, *supra*). Como sabemos, tal declaración no constituiría prueba de referencia. Regla 60, Regla de Evidencia de 1979, 32 L.P.R.A. Ap. IV.; Regla 801, Reglas de Evidencia de 2009.

[31] *Crawford v. Washington*, *supra,* pág. 59. Véase, además, *California v. Green*, 399 U.S. 149 (1970).

Con relación a la definición de lo que constituye una declaración **testimonial** según *Crawford v. Washington*, *supra*, el Tribunal Supremo federal señaló expresamente que no daría en el caso una explicación exhaustiva del término.[32] No obstante, sí señaló algunas declaraciones que debían considerarse como **testimoniales**, tales como: declaraciones en un testimonio *ex-parte* vertido durante un juicio, *affidavits*, interrogatorios bajo custodia, testimonios anteriores en los cuales el acusado no haya tenido la oportunidad de contrainterrogar, declaraciones vertidas antes del juicio en circunstancias que el declarante razonablemente pudiera esperar que fueran usadas por el Ministerio Público, declaraciones extrajudiciales como *affidavits*, deposiciones, testimonios anteriores  y declaraciones hechas en circunstancias que razonablemente pudieran llevar a un testigo objetivo a creer que tal declaración pudiera estar disponible para utilizarse en un juicio posterior.[33]

---

[32] *Crawford v. Washington*, *supra*, pág. 68.

[33] *Íd.*, págs. 51-52. Las expresiones del Tribunal Supremo federal fueron las siguientes:

> '*ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,'...'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions'... 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial'... These formulations all share a common nucleus and then define the Clause's coverage at

**Davis v. Washington**, 547 U.S. 813 (2006):

La Opinión del Tribunal Supremo federal en *Davis v. Washington*, *supra*, involucra en realidad dos casos que fueron consolidados, siendo el segundo de ellos *Hammon v. Indiana*, 126 S. Ct. 2266 (2006). Los hechos de *Davis v. Washington*, *supra*, son los siguientes: en un momento dado una operadora del sistema de emergencia 911 recibe una llamada telefónica, pero la llamada finaliza antes de que nadie alcance a decir nada. Entonces, la operadora revierte la llamada, la cual contesta la Sra. Michelle McCottry. La operadora percibe que la Sra. McCottry se encuentra en medio de un episodio de violencia doméstica con su novio, el cual resultó ser el acusado, el Sr. Adrian Davis. La operadora inicia un diálogo con la Sra. McCottry.[34]

---

various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition--for example, *ex parte* testimony at a preliminary hearing. (Citas omitidas.)

[34] La conversación fue la siguiente:

*Operadora:* "¿Qué está pasando?"
*McCottry:* "El está aquí cayéndome encima otra vez."
*Operadora:* "OK. Escúchame detenidamente. ¿Estás en una casa o en un apartamento?"
*McCottry:* "Estoy en una casa."
*Operadora:* "¿Hay armas ahí?"
*McCottry:* "No. Él está usando sus puños."
*Operadora:* "OK. ¿Él ha estado bebiendo?"
*McCottry:* "No."
*Operadora:* "OK, cariño. Ya he dado inicio a la ayuda. Quédate en la línea conmigo, ¿OK?"
*McCottry:* "Estoy en la línea."
*Operadora:* "Escúchame detenidamente. ¿Sabes su apellido?"

Después que Davis se fue de la escena, McCottry comenzó a hablar nuevamente pero la operadora la interrumpió diciéndole "para de hablar y contesta mis preguntas." Entonces McCottry le dijo a la operadora, entre otras cosas, que Davis había venido a la casa a buscar sus cosas porque ella se estaba mudando. McCottry también le describió a la operadora la forma en que Davis la agredió. La operadora le dijo que la policía ya iba de camino, pero que iban a inspeccionar el área primero para buscar a Davis. La policía llegó en cuatro minutos y encontró a McCottry temblando y con "heridas frescas en su antebrazo y cara".

Por estos hechos, la Policía presentó cargos contra Davis por violación a una orden de protección. Los únicos testigos de cargo fueron los dos policías que respondieron a la llamada de la operadora del sistema 911. Ambos testificaron que al llegar a la escena notaron que McCottry exhibía heridas que aparentaban ser recientes, pero ninguno de los dos pudo testificar con relación a quién las había causado.

McCottry no compareció al juicio por lo que el Ministerio Público presentó, y así fue admitido por el

---

*McCottry: "Es Davis."*
*Operadora: "¿Davis? OK, ¿cuál es su primer nombre?".*
*McCottry: "Adrian."*
*Operadora: "¿Cuál?"*
*McCottry: "Adrian."*
*Operadora: "¿Adrian?"*
*McCottry: "Sí."*
*Operadora: "OK. ¿Cuál es su inicial?"*
*McCottry: "Martell. Él salió corriendo."* (Trad. nuestra)

tribunal, la grabación de lo conversado el día de los hechos entre ésta y la operadora del sistema 911. Davis objetó oportunamente la admisión de la grabación argumentando que ésta violaba su derecho a la confrontación de la Sexta Enmienda de la Constitución federal, *supra*. El jurado emitió un veredicto de culpabilidad. Finalmente, Davis apeló al Tribunal de Apelaciones y al Tribunal Supremo de Washington, pero ambos foros confirmaron la convicción.

Los hechos en el caso de *Hammon v. Indiana*, *supra*, son los siguientes: tarde en la noche dos policías responden ante una llamada de un disturbio doméstico en la casa de los esposos Hershel y Amy Hammon. Al llegar, encuentran a Amy Hammon frente a la casa, sola y algo atemorizada. Amy les dijo a los policías que no había pasado nada y les dio permiso para que entraran a la casa. Al entrar, los policías pudieron notar signos de violencia en la casa y encontraron a Hershel Hammon en la cocina. Hershel les dijo que él y Amy habían tenido una discusión, pero que "todo estaba bien ahora" y que la discusión nunca se había tornado física.

Para ese entonces Amy había entrado nuevamente a la casa y mientras uno de los policías se quedó con Hershel en la cocina, el otro fue a la sala y la interrogó nuevamente acerca de lo que había ocurrido. Hershel hizo varios intentos por participar en la conversación que el

policía y su esposa estaban teniendo, pero no le fue permitido por el policía que lo acompañaba.

Después de escuchar el testimonio de Amy, el policía la llevó a completar y firmar una declaración jurada por agresión, en la que ésta describía el acto violento cometido por el Sr. Hammon: había roto varias cosas en la casa, la había empujado hacia el piso en medio de cristales rotos y la había golpeado en el pecho, entre otras cosas.

Por estos hechos, Hershel Hammon fue acusado por violencia doméstica y violación a su probatoria. Amy Hammon no compareció al juicio, a pesar de haber sido citada. Ante la ausencia de la Sra. Hammon, el Ministerio Público presentó la declaración jurada que Amy Hammon había hecho el día de los hechos. El policía que la entrevistó y le tomó la declaración jurada también testificó en el juicio relatando todo lo que Amy le había dicho, y autenticando el documento.

A pesar de la oportuna objeción del acusado, por ser violatorio a su derecho a la confrontación, el tribunal admitió bajo dos excepciones a la regla de exclusión de prueba de referencia —declaraciones espontáneas por excitación y declaraciones contemporáneas a la percepción— tanto las declaraciones que Amy Hammon le hizo al policía, como la declaración jurada que ésta suscribió. Finalmente, el tribunal encontró a Hershel Hammon culpable por ambos

cargos, fallo que fue confirmado por el Tribunal de Apelaciones, así como por el Tribunal Supremo de Indiana.

Como vemos, en *Davis v. Washington*, *supra*, el Tribunal Supremo Federal se enfrentó a la admisibilidad de las declaraciones de una testigo no disponible, hechas mediante una llamada al sistema de emergencias 911. En ese sentido era menester definir el carácter testimonial o no testimonial de declaraciones emitidas bajo tales circunstancias. El Tribunal Supremo de los Estados Unidos confirma la convicción de Adrian Davis al pautar -evitando nuevamente una lista exhaustiva- que **una declaración no es testimonial cuando, aún hecha en el curso de un interrogatorio de la policía, se hace bajo circunstancias que objetivamente indican que el propósito principal era recibir ayuda en medio de una emergencia.** [35]

Por otro lado, **declaraciones hechas durante una llamada al sistema de emergencia 911 son testimoniales -y por lo tanto sujetas a las delimitaciones de *Crawford v. Washington*, *supra*- cuando ya no existe el riesgo potencial creado por la emergencia, y el objetivo principal de la declaración es establecer o probar eventos que ya pasaron, y que son potencialmente relevantes para una posterior presentación de cargos por el Ministerio Público.** [36]

Según señala el Tribunal Supremo federal, las declaraciones de la víctima -Sra. McCottry- en el caso de

---

[35] *Davis vs. Washington, supra,* pág. 822.

[36] *Íd.*

*Davis v. Washington*, *supra*, fueron no testimoniales –y por lo tanto sujetas únicamente al escrutinio de la regla de exclusión de prueba de referencia– desde el inicio de la llamada hasta  el momento en que el acusado Davis se fue de la casa y la operadora le pidió a McCottry que se callara. El restante de lo declarado fue testimonial.[37]

En el caso de *Hammon v. Indiana*, *supra*, el Tribunal Supremo de los Estados Unidos revocó la convicción de Hammon al determinar que las declaraciones de su esposa hechas a la policía en la escena del crimen, aunque no fueron tan formales como las del caso de *Crawford v. Washington*, *supra*, fueron testimoniales. Esto, pues, al examinarlo de manera objetiva, el propósito principal tanto del interrogatorio como de la preparación del *affidavit*, era el investigar conducta ya pasada, que involucraba la posibilidad de un acto criminal.[38]

### *Meléndez-Díaz v. Massachusetts*, 129 S. Ct. 2527; L.Ed 2d 314 (2009):

En *Meléndez-Díaz v. Massachusetts*, *supra*, el Tribunal Supremo resuelve exactamente la misma controversia que confrontamos en el caso de autos. Los hechos son los siguientes: Luis E. Meléndez-Díaz fue acusado junto a otras personas por tráfico y distribución de cocaína. Durante el juicio, el Ministerio Público solicitó, en virtud de una ley del estado de Massachusetts, la admisión

---

[37] *Íd.*, págs. 828-829.

[38]  *Íd.,* págs. 829-830.

como prueba sustantiva del informe del perito químico, aun cuando el testigo perito que lo preparó no se encontraba disponible para testificar.

Meléndez-Díaz objetó la admisión del informe químico fundamentándose en que, al no poder contrainterrogar al perito químico, la admisión del informe constituía una violación a su derecho a la confrontación bajo la Sexta Enmienda, *supra*. El Tribunal admitió el informe bajo la ley local de Massachusetts, la que contemplaba que, luego que los certificados químicos fueran jurados ante notario, se podrían someter como prueba *prima facie* de que eran certeros.[39] El jurado encontró culpable a Meléndez-Díaz. Finalmente, ambos foros apelativos del estado de Massachusetts declararon no ha lugar la apelación de Meléndez-Díaz.

Al analizar el propósito de este tipo de informe, el Tribunal Supremo estableció en *Meléndez-Díaz v. Massachusetts*, *supra,* **el carácter testimonial de un informe de laboratorio químico forense que es preparado para presentarse como prueba sustantiva contra un acusado en el juicio.** Este tipo de informe es testimonial porque, como en el caso de autos, su objetivo es declarar que la

---

[39] En Puerto Rico, además de la Regla 65(H) de las de Evidencia, *supra*, que -similar a la Ley de Massachusetts- permitía la admisión *prima facie* de cualquier récord oficial independientemente de que el declarante estuviera disponible para testificar, o de si alguien testificara sobre ese récord, el Art. 27 de la ley orgánica del Instituto de Ciencias Forenses, Ley Núm. 13 de 24 de julio de 1985, según enmendada, señala que las copias certificadas de informes de autopsias y de análisis científicos serán admisibles en los tribunales del Estado Libre Asociado de Puerto Rico, sujeto a lo dispuesto en las Reglas de Evidencia de Puerto Rico. 34 L.P.R.A. sec. 3027.

substancia encontrada en posesión del acusado es cocaína, en cierta cantidad, como reclama el Ministerio Público.

El informe químico es testimonial porque "testifica" lo que precisamente sería el testimonio que se esperaría que el perito químico vertiera, si compareciera al juicio: se esperaría que testificara con relación a que una sustancia –que la cadena de evidencia ya conectó con el acusado– es la cocaína o marihuana que el Ministerio Público reclama que poseía el acusado. Como señala *Meléndez-Díaz v. Massachusetts*, *supra*:

> "The fact in question is that the substance found in the possession of Melendez-Diaz and his codefendants was, as the prosecution claimed, cocaine -- the precise testimony the analysts would be expected to provide if called at trial. **The "certificates" are functionally identical to live, in-court testimony, doing "precisely what a witness does on direct examination.**[40] (Énfasis suplido.)

En *Meléndez-Díaz v. Massachusetts*, *supra*, el Tribunal Supremo federal se enfrentó a varios argumentos legales que cuestionaban el carácter testimonial del informe químico presentado contra el acusado como prueba sustantiva. En primer lugar se argumentó que el informe químico no era testimonial –y por lo tanto no sujeto a requisito de la Cláusula de Confrontación de la Sexta Enmienda conforme se estableció en *Crawford*– porque éste no incriminaba directamente al acusado de conducta ilegal

---

[40] *Meléndez-Díaz v. Massachusetts*, 129 S. Ct. 2527, 2533 (2008).

alguna; *"they are not 'accusatory' witnesses".*[41] Según este argumento, un informe químico se torna inculpatorio sólo cuando, unido a otra evidencia, conecta al acusado con la actividad criminal que se le imputa.

Este argumento es rechazado por el Tribunal Supremo federal señalando básicamente que, según la Sexta Enmienda de la Constitución Federal -de la cual es tomada en todas sus partes la Cláusula de Confrontación de la Constitución de Puerto Rico- en los procesos criminales sólo existen dos tipos de testigos: aquellos en contra del acusado y aquellos a favor. Por lo tanto, *"[t]o the extent the analysts were witnesses... they certainly provided testimony against petitioner, proving one fact necessary for his conviction -- that the substance he possessed was cocaine.*[42]

Otro argumento en contra del carácter testimonial de un informe químico en circunstancias como las del caso de autos es que no son "testigos convencionales". Esto es, no son testigos *ex parte* típicos o comunes (*typical or ordinary*) que testifican con relación a lo que observaron en un evento en el pasado, sino que este tipo de informe es realizado de manera contemporánea a los análisis de laboratorio que el químico realiza.

A este argumento el Tribunal Supremo federal responde, *inter alias*, que este tipo de argumento fue

---

[41] *Íd.*

[42] *Íd.*

rechazado precisamente en el caso de *Davis v. Washington,*
*supra*, en el que se estableció que unas declaraciones
admitidas como excepción a la regla de exclusión de prueba
de referencia por ser contemporáneas a la percepción, no
debieron serlo en la medida que eran testimoniales.[43]

Además, en *Meléndez-Díaz v. Massachusetts*, *supra*, el
Tribunal Supremo federal se enfrentó al argumento de que
un informe químico no es "testigo convencional" -y por lo
tanto no sujeto al rigor de la Cláusula de Confrontación-
porque no es una declaración que surja como respuesta a un
interrogatorio.[44] Nuevamente este argumento fue rechazado
por el Tribunal señalando que, en el contexto de un
testigo contra un acusado, no existe diferencia con
relación a si la declaración surge como una expresión
voluntaria o en respuesta a un interrogatorio.
Específicamente el Tribunal Supremo federal señala,
citando en parte a *Davis v. Washington,* *supra*, lo
siguiente:

> As we have explained,"[t]he Framers were no
> more willing to  exempt from cross-examination
> volunteered testimony or answers to open-ended
> questions than they were to exempt answers to
> detailed interrogation." Respondent and the
> dissent cite no authority, and we are aware of
> none, holding that a person who volunteers his
> testimony is any less a "'witness against' the
> defendant," than one who is responding to
> interrogation. In any event, the analysts'

---

[43] También se argumentó en *Meléndez-Díaz v. Massachusetts*, *supra*, que
este tipo de informe químico no es un "testigo convencional" porque
no atestigua con relación a crimen alguno ni a acción humana alguna
relacionada con un crimen. No obstante, tal argumento fue rechazado
prácticamente de plano por el Tribunal Supremo federal.

[44] *Meléndez-Díaz v. Massachusetts*, 129 S. Ct. 2527, 2533 (2008).

affidavits in this case *were* presented in response to a police request.[45] (Citas omitidas)

V

***Récord público o de negocios preparados como parte del curso ordinario del negocio, a la luz de los resuelto en Meléndez-Díaz v. Massachusetts, supra.***

En el caso de autos, la Procuradora General reclama la admisibilidad por sí solo del informe químico que intentó introducir el Ministerio Público durante el juicio, basado en que la Regla 65(H) de las Reglas de Evidencia de 1979, *supra*, lo autoriza, inclusive ante la disponibilidad del perito forense que lo preparó. Señala la Procuradora General que

> debemos recordar que, **debido a la confiabilidad que se le otorga a un récord o informe oficial**, los requisitos para satisfacer las exigencias de la Regla 65(H) son bastante laxos al permitir que el custodio del informe o "algún testigo" declare sobre la confiabilidad. Aunque de ordinario el testigo es el funcionario o empleado encargado de la sección de archivo o récord del negocio o actividad en cuestión, cualquier otro funcionario con conocimiento sobre la preparación del asiento o récord puede declarar sobre si éste cumple con los criterios que establece la Regla 65.[46] (Énfasis suplido.)

Ante esta argumentación debemos advertir que en *Meléndez-Díaz v. Massachusetts*, *supra*, pág. 2538, el Tribunal Supremo de los Estados Unidos, fundamentándose en *Palmer v. Hoffman, 318 U.S. 109, 63 S. Ct. 477, 87 L. Ed. 645 (1943)*, señaló que, "*[d]ocuments kept in the regular course of business may ordinarily be admitted at*

---

[45] *Íd.*

[46] Petición de *Certiorari*, pág. 12.

*trial despite their hearsay status. But that is not the case if the regularly conducted business activity is the production of evidence for use at trial".*

Por lo tanto, en todo caso en el que la intención del Ministerio Público sea el ofrecer como evidencia sustantiva- esto es, evidencia para probar un hecho que inculpa al acusado- un récord público o de negocios preparado como parte del curso ordinario del negocio, deberá presentar como testigo -sujeto a interrogatorio- a la persona que preparó dicho récord, si el récord público o de negocios fue preparado con el propósito de presentarlo en un proceso judicial.

Como hemos dicho e implica la Procuradora General en su argumentación, ciertamente la poderosa excepción a la cláusula de exclusión de la prueba de referencia que constituía la derogada Regla 65(H) de las Reglas de Evidencia de 1979, *supra,* se enmarcaba en la confiabilidad intrínseca de estos récords e informes oficiales. No obstante, esa confiabilidad ya no es suficiente. El Tribunal Supremo federal se enfrentó también al argumento de la "confiabilidad" de esos informes químicos en *Meléndez v. Massachusetts*, *supra.* Allí se argumentó que existe una diferencia, para propósitos de la Cláusula de Confrontación, entre un testigo que a través de su testimonio relata hechos o eventos ("*historical events*"), el cual es propenso a distorsión o manipulación, y el testimonio vertido

mediante un certificado o informe toxicológico, el cual es el resultado de una "prueba científica neutral" ("neutral, scientific testing").

A este argumento el Tribunal Supremo federal replicó citando lo expresado en el caso que inició este reenfoque de la Cláusula de Confrontación de la Sexta Enmienda, *supra*, *Crawford v. Washington*, *supra*, y que ya citamos en parte en esta Opinión:

> "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . . Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the *Sixth Amendment* prescribes."

Ahora bien, aunque en el presente caso el recurso apelativo fue presentado antes de que se pautara la normativa de Meléndez Díaz v. Massachusetts, *supra*, debemos aplicar dicha norma de forma retroactiva. Ello, porque tal y como señalamos en Pueblo v. González Cardona, 153 D.P.R. 765, 772 (2001), y como cabalmente discute el señor Juez Presidente en su Opinión de Conformidad, las nuevas normas jurisprudenciales que aplican a los procesos penales, tienen efecto retroactivo y aplican "a todos aquellos casos que al momento de la adopción de la nueva norma *no hayan advenido finales y firmes*". (Énfasis en el original y escolio omitido).

Por todo lo anterior, conforme a los criterios expresados en *Meléndez-Díaz v. Massachusetts*, *supra*, concluimos que los informes preparados por el I.C.F. en las circunstancias como las del caso de autos son claramente testimoniales. Además, siendo que en el caso de autos el Ministerio Público nunca justificó la no disponibilidad de la químico González, y el recurrido Guerrido López nunca tuvo la oportunidad de contrainterrogar a dicha testigo con relación a ese informe, entendemos que las circunstancias se ajustan perfectamente a aquellas consideradas en *Meléndez-Díaz v. Massachusetts*, *supra*.

**Por lo tanto, establecemos que no es admisible como evidencia sustantiva contra un acusado un informe químico cuando el técnico que preparó dicho informe no comparece como testigo en el juicio al momento que se solicita su admisión, y cuando el acusado no tuvo la oportunidad de contrainterrogar a ese testigo previamente, con relación a ese informe.**

**VI**

Por los fundamentos expuestos en esta Opinión, se confirma la sentencia del Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.

Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>    Peticionario<br><br>        v.<br><br>Chrisantoni Guerrido López<br><br>    Recurrido | CC-2007-776 | Certiorari |

SENTENCIA

San Juan, Puerto Rico a, 23 de septiembre de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se confirma la sentencia del Tribunal de Apelaciones.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton emitió opinión de conformidad. La Juez Asociada señora Rodríguez Rodríguez concurre con el resultado sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

        v.                CC-2007-776      Certiorari

Chrisantoni Guerrido López

    Recurrido

Opinión de Conformidad emitida por el JUEZ PRESIDENTE SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 23 de septiembre de 2010.

Coincidimos con el resultado al que llega una mayoría de este Tribunal en el día de hoy, pero hemos decidido suscribir esta ponencia para examinar más detalladamente la aplicación retroactiva de la norma pautada en Meléndez Díaz v. Massachusetts, 129 S. Ct. 2527 (2009), al caso de epígrafe. Como la normativa de Meléndez Díaz v. Massachusetts se pautó luego de presentado el recurso apelativo del caso de autos, a nuestro entender procede como cuestión de umbral examinar su aplicación a la controversia ante nos.

I.

El Sr. Chrisantoni Guerrido López fue acusado por infracciones al Art. 404 de la Ley de Sustancias Controladas, Ley Núm. 4 de 23 de junio de 1971, 24 L.P.R.A. 2404. El día del juicio, el Ministerio Público intentó presentar en evidencia el informe de la química que le hizo los correspondientes análisis a las presuntas sustancias controladas que se le ocuparon al señor Guerrido López. No obstante, el Ministerio Público intentó presentar el referido informe en ausencia, y ante la aparente no disponibilidad, de la perito que realizó éste. Ante una oportuna objeción de la defensa en la que adujo que permitir que se presentara dicho informe en ausencia de la perito que lo realizó era una violación al derecho constitucional a la confrontación de prueba presentada en su contra durante un proceso penal, el Tribunal de Primera Instancia la declaró con lugar.

Por esta razón, el Ministerio Público acudió ante el Tribunal de Apelaciones y alegó que conforme con la antigua Regla 65(H) de Evidencia el referido informe era admisible como excepción a la regla de exclusión de prueba de referencia. En específico, arguyó que dicha regla no requiere la no disponibilidad del testigo declarante para la admisión de su declaración. El Tribunal de Apelaciones, sin embargo, confirmó el dictamen del foro de instancia y señaló que, entre otras cosas, el Ministerio Público no

llegó a probar la no disponibilidad de la perito química que realizo el informe en controversia.

Inconforme, en el 2007 el Ministerio Público acudió ante nos y, esencialmente, esbozó las miasmas alegaciones que esgrimió ante el Tribunal de Apelaciones. Además, en una moción informativa con fecha del 24 de marzo de 2008 el Ministerio Público le informó a este Foro sobre la existencia de un caso muy similar al de autos que se estaba dirimiendo en ese momento ante el Tribunal Supremo federal. Dicho caso es Meléndez Díaz v. Massachusetts, *supra*, el cual se decidió el 25 de junio de 2009.

A la luz de estos hechos, debemos determinar y fundamentar si la normativa pautada en Meléndez Díaz v. Massachusetts, *supra*, le debe aplicar retroactivamente al caso de autos, que estuvo pendiente ante este Tribunal cuando se pautó la referida normativa.

II.

Como hemos expresado anteriormente, nuestra doctrina de retroactividad o irretroactividad de nuevas normas jurisprudenciales de carácter penal ha estado íntimamente ligada a las normas adoptadas por el Tribunal Supremo de Estados Unidos. Pueblo v. González Cardona, 153 D.P.R. 765, 771 (2001). Por esta razón, es preciso recordar que antes de 1965 el Tribunal Supremo federal aplicó los fallos jurisprudenciales a cualquier caso pendiente para revisión judicial de forma retroactiva. C. H. Whitebread & C.

Slobogin, Criminal Procedure: an analysis of cases and concepts, NY, Ed. 4, 2000, pág. 832. Sin embargo, como bien se reconoce en Linkletter v. Walker, 381 U.S. 618 (1965), la aplicación retroactiva de nuevas normas jurisprudenciales podría tener grandes costos al sistema de justicia criminal. Más aún, cuando en la década de 1960 la Corte Warren amplió significativamente los derechos constitucionales de un acusado. Pueblo v. Delgado Rodríguez, 108 D.P.R. 196, 200 (1978) (Opinión particular del ex Juez Presidente señor Trías Monge).

Por esta razón, en Linkletter v. Walker, *supra*, y su progenie se establecieron los requisitos para determinar si debía aplicarse retroactivamente una normar jurisprudencial de carácter penal. Estos requisitos los acogimos en Rivera Escuté v. Jefe de Penitenciaría, 92 D.P.R. 765 (1965). Así, el Tribunal Supremo federal determinó que los criterios a tales efectos serían los siguientes: (1) el propósito que persigue la norma recién establecida; (2) el grado de confianza generado por la antigua norma, y (3) el impacto que tendría en la administración de la justicia la aplicación retroactiva de la nueva norma. Hankerson v. North Carolina, 423 U.S. 233 (1977); Desist v. United States, 394 U.S. 244 (1969); Stovall v. Denno, 388 U.S. 293 (1967); Johnson v. New Jersey, 384 U.S. 719 (1966); Tehan v. United States ex rel. Shott, 382 U.S. 406 (1966); Linkletter v. Walker, *supra*.

No obstante, esta normativa de retroactividad fue sustancialmente revisada en el caso U.S. v. Johnson, 457 U.S. 537 (1982), mediante el cual se pautó una distinción entre aquellas convicciones que habían advenido finales y aquellas que estaban pendientes de revisión directa. En esencia, se determinó que, al amparo de la Cuarta Enmienda de la Constitución de Estados Unidos, la nueva norma jurisprudencial aplicaría retroactivamente a todos aquellos casos que no hubiesen advenido finales. U.S. v. Johnson, *supra*. Posteriormente, esta determinación fue extendida a revisiones directas al amparo de otras cláusulas constitucionales. Véanse Shea v. Louisiana, 470 U.S. 51 (1985); Griffith v. Kentucky, 479 U.S. 314 (1987).

Asimismo, en Griffith v. Kentucky, *supra*, el máximo foro federal hizo extensiva la aplicación retroactiva de todas las normas constitucionales de carácter penal a todos aquellos casos que al momento de su adopción no hubieran advenido finales. Pueblo v. González Cardona, *supra*. De este modo, se adoptó la concepción del Juez Asociado Harlan en la cual la no aplicación de nuevas normas jurisprudenciales a casos que estén pendientes de revisión directa viola las normas básicas de adjudicación.[47] Esta norma la acogimos en Pueblo v. González Cardona, *supra*. Por

---

[47]Es preciso mencionar que en la Opinión Disidente del Juez Harlan en Desist v. United States, *supra*, pág. 257, y en su Opinión Concurrente y Disidente en parte en Mackey v. United States, 401 U.S. 667, 675 (1971) éste critica fuertemente la aplicación del estándar clásico de retroactividad pautado en Linkletter v. Walker, *supra*, a casos pendientes de revisión colateral. Posteriormente, esta visión fue adoptada en Teague v. Lane, 489 U.S. 288 (1989).

otro lado, en Teague v. Lane, *supra*, acogiendo las demás concepciones del Juez Asociado Harlan al respecto, el Tribunal Supremo federal decidió que como regla general una norma jurisprudencial no iba a aplicar retroactivamente si se trata de un caso de ataque colateral y no directo.

Por lo tanto, según los parámetros constitucionales pautados por dicho foro, una nueva norma jurisprudencial de aplicación a los procesos penales deberá tener efecto retroactivo sobre todos aquellos casos que al momento de la adopción de la nueva norma no hayan advenido finales y firmes. Pueblo v. González Cardona, *supra*, pág. 772. A su vez, estos parámetros son de aplicación a los casos estatales. Griffith v. Kentucky, supra.

III.

En el presente caso, el Ministerio Público acudió ante nos en el 2007 para que revocáramos una determinación del Tribunal de Apelaciones en el caso de autos. En ese momento todavía no se había pautado la normativa de Meléndez Díaz v. Massachusetts, *supra*, la cual se estableció el 25 de junio de 2009. No obstante, en el día de hoy se dirime una controversia prácticamente idéntica a la resuelta en Meléndez Díaz v. Massachusetts, *supra*. Así, durante el juicio el señor Guerrido López objetó que se presentara en evidencia un informe pericial relativo al análisis sobre una alegada sustancia controlada que se le incautó. Esto, pues el Ministerio Público trató de presentar el informe

con el testimonio de una perito que no fue la que realizó el mismo. Por lo tanto, el señor Guerrido López alegó que al así proceder se le violaba el derecho constitucional a la confrontación.

Mientras el recurso de *certiorari* presentado por el Ministerio Público estaba pendiente ante este Tribunal para su correspondiente atención, el Tribunal Supremo federal decidió el caso de <u>Meléndez Díaz v. Massachusetts</u>, *supra*. Así, se pautó la norma de que, sujeto a la cláusula de confrontación federal y a su interpretación por el Tribunal Supremo federal, un informe químico que identifique determinadas sustancias halladas a un acusado como sustancias controladas no es admisible en evidencia contra éste salvo que la persona que realizó el referido informe comparezca a declarar al juicio o el acusado haya tenido la oportunidad de contrainterrogar a ésta en relación al informe. Precisamente ésta es la normativa que resuelve la controversia ante nos a la luz de la cláusula de confrontación de la Enmienda Sexta de la Constitución de Estados Unidos. En este caso no se presentó en sala a la perito que realizó el informe, por lo que correctamente se decide que, al amparo de lo pautado en <u>Meléndez Díaz v. Massachusetts</u>, *supra*, el informe no es admisible como evidencia en contra del señor Guerrido López.

Como mencionamos anteriormente, no todas las nuevas normas jurisprudenciales aplican a cualquier recurso que al momento de emitirse la referida norma se encuentre

pendiente de adjudicación. Sin embargo, en este caso nos encontramos ante un ataque directo que al menos requería un mínimo de discusión sobre la retroactividad de la norma aplicable al caso de autos.

A tenor con los principios anteriormente esbozados, concluimos que la normativa constitucional establecida jurisprudencialmente en Meléndez Díaz v. Massachusetts, *supra*, en lo que respecta a la cláusula de confrontación, tiene efecto retroactivo en nuestra jurisdicción y es de aplicación a todos aquellos casos que al momento de la adopción de la nueva normativa no hayan advenido finales y firmes. Por lo tanto, dado que al momento de adjudicación la norma vigente en nuestro ordenamiento es la pautada, entendemos que debe ser de aplicación al caso de autos.

Federico Hernández Denton
Juez Presidente