## ESTADO LIBRE ASOCIADO DE PUERTO RICO
## TRIBUNAL DE APELACIONES
## PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO <br><br> Parte Apelada <br><br><br> v. <br><br><br> OSVALDO J. FERRER MARTÍNEZ <br><br> Parte Apelante | KLAN202300837 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez <br><br> Caso Núm.: <br><br> ISCR202200622 <br> ISCR202200623 <br> ISCR202200624 <br> ISCR202200625 <br><br> Sobre: <br> Art. 93 (a) C.P. <br> Art. 6.05 L.A. <br> Art. 6.14 L.A. <br> Art. 6.22 L.A. |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Cruz Hiraldo y la Jueza Prats Palerm[1].

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de junio de 2024.

Comparece el apelante, Osvaldo Ferrer Martínez (en adelante, el señor Ferrer o apelante) y nos solicita que revoquemos la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Mayagüez (en adelante, TPI o foro primario), el 18 de agosto de 2023. Mediante el referido dictamen, el TPI condenó al apelante a una pena de 141 años de reclusión. Ello, tras determinar la culpabilidad del apelante de los delitos tipificados en el Artículo 93 (a) del Código Penal de Puerto Rico del 2012, 33 LPRA sec. 5142 (en adelante, Código Penal), y los Artículos 6.05, 6.14, 6.22 de la Ley Núm. 168 de 11 de diciembre de 2019, conocida como Ley de Armas de Puerto Rico de 2020, 25 LPRA sec. 466d, 466m y 466u (en adelante, Ley de Armas).

Por los fundamentos que expondremos a continuación, se Confirma a la *Sentencia* apelada.

---

[1] Mediante Orden Administrativa OATA-2023-212, se designó a la Hon. Annette M. Prats Palerm en sustitución del Hon. José Johel Monge Gómez.

**I.**

Por los hechos acontecidos el 30 de septiembre de 2020, en San Germán, Puerto Rico, el Ministerio Público presentó cuatro (4) *Denuncias* contra el señor Ferrer por la infracción al Artículo 93(a) del Código Penal, *supra,* y los Artículos 6.05, 6.14 y 6.22 de la Ley de Armas, *supra.*

Luego de los trámites de rigor, se celebró el juicio en su fondo desde el 12 de junio al 21 de julio de 2022 para un total de siete (7) vistas. Tanto el Ministerio Público como la Defensa presentaron prueba testifical y documental marcados como *exhibits.* En el caso del Ministerio Público, sus testimonios consistieron en los siguientes: (1) Víctor Casiano Segarra, (2) Agente Wilson Ortiz Ruiz, (3) Olfred Ortiz Laracuente, (4) Dennis Ramos Vargas, (5) Merphys Rivera Alicea, (6) Félix Vázquez Solís, (7) Maria Hernández Miranda, (8) Agente Waldemar Ramírez Rodriguez, (9) Agente Jaime Ruiz Medina, (10) Reynaldo Ramos Mattei, (11) Agente Leslie Candelaria Ramos, (12) Freddy Cancel González, (13) Carlos del Valle Arroyo, (14) Minnelly Hernández Huertas, (15) Agente José Acevedo Olivencia. Por otro lado, la prueba testifical de la Defensa consistió en lo siguiente: (1) Janice Torres Torres y (2) Carlos Reyes Ortiz.

En lo aquí pertinente, se incluye un resumen de la prueba testifical que desfiló durante el juicio y que este Tribunal Revisor cuidadosamente examinó.

El segundo testigo que presentó el Ministerio Público fue el Agente Wilson Ortiz Ruiz (en adelante, Agente Ortiz). En corte abierta, el Agente Ortiz declaró que el 30 de septiembre de 2020 se recibió una querella a las 6:15 a.m. por el sistema de emergencia 9-1-1 sobre una persona acostada en la carretera 114, km 10.2. Tras esto, el Agente Ortiz se personó en el referido lugar a las 6:35 a.m. donde localizó el cuerpo boca arriba de una fémina vestida con una blusa blanca, mahón corto color azul, chanclas negras, con sangre en la cabeza y sin vida. No obstante,

declaró que poco después se percató que no era una mujer sino un hombre.

El cuarto testigo que presentó el Ministerio Público fue Dennis Ramos Vargas (en adelante, el señor Ramos). Durante el examen directo, el señor Ramos declaró que el 30 de septiembre de 2020 identificó el cuerpo de su hermano Daniel Ramos Vargas (en adelante, occiso) en la carretera 114 en San Germán, Puerto Rico. Asimismo, testificó que el occiso tenía 33 años, que trabajaba en una fábrica, que vivía en un caserío, que se identificaba y vestía como mujer utilizando el nombre de Michelle. Continuó declarando que, ese mismo día, visitó junto a la Policía el apartamento del occiso el cual estaba cerrado con el televisor encendido y todas sus pertenencias, incluyendo cartera y documentos personales, excepto las llaves del apartamento y su celular.

El octavo testigo que presentó el Ministerio Público fue el Agente Waldemar Ramírez Rodríguez (en adelante, Agente Ramírez). Testificó que, el 25 de junio de 2021 a las 9:45 a.m., el Teniente Jayson Reyes le refiere una confidencia recibida por el Agente Carlos Rodríguez mediante llamada telefónica en la cual una voz de hombre indicó que Gustavo Alexis González había alquilado una residencia en el sector Las Cruces en Rincón -donde había un vehículo con letras escritas en pintura- junto a Freddy Cancel González y que estos utilizaban un vehículo Chevrolet Impala color gris. Además, el Agente Ramírez expresó que existía una orden de arresto contra los dos hombres mencionados en la confidencia. Prosiguió relatando que, en esa misma fecha entre las 11:00 a.m. y 12:00p.m., se dirigió al sector Las Cruces en Rincón e identificó la residencia descrita en la confidencia. Añadió que, un vecino aledaño a la mencionada residencia le indicó que se estaban quedando dos personas que no eran del lugar. Además, el Agente Ramírez relató que se retiró del lugar y regresó a las 5:00 p.m. con personal de la Policía, de la División de Inteligencia y de la División de Homicidios. Asimismo, sostuvo que hicieron una entrada táctica a la residencia, donde encontraron un AK47, y una mujer les explicó que la misma

estaba alquilada hacia tres semanas por unos jóvenes que no eran del área. Especificó el Agente Ramírez que dicha mujer resultó ser la dueña de la residencia y quien luego prestó su consentimiento para un allanamiento. Simultáneamente, observó que un vehículo Chevrolet Impala color gris se acercaba y, acto seguido, dicho vehículo comenzó la marcha en retroceso cayendo por un barranco. Expresó que, sus compañeros intervinieron en tal suceso y estos visualizaron a cuatro personas dentro del vehículo, no obstante, solo lograron detener a un hombre llamado Gabriel Olmedo. Luego, el Agente Ramírez explicó que una grúa sacó el vehículo del monte y, cuando el personal de la División de Servicios Técnicos alumbró el interior de este, se observó varias pistolas negras tanto en su parte frontal y posterior. Añadió que, una vez estando en la Comandancia, verificó la tablilla del vehículo el cual resultó que tenía un gravamen de hurtado mediante *carjacking* en Carolina, Puerto Rico.

El undécimo testigo del Ministerio Público fue la Agente Leslie Candelaria Ramos (en adelante, Agente Candelaria). Durante su testimonio, expresó que el 22 de junio de 2021 atendió un asesinato del señor Jan Rosario ocurrido en el residencial Monte Isleño de Mayagüez. Mencionó, además, la Agente Candelaria que por la comisión del mencionado delito era sospechoso Freddy Cancel González, entre otros. A su vez, declaró que el 25 de junio de 2021 se recibió una confidencia en la División de Inteligencia y que, ese mismo día en horas de la tarde, el Agente Ramírez había identificado una residencia en Rincón donde se ocultaba Freddy Cancel González. Explicó, la Agente Candelaria, que como resultado de la intervención en Rincón se obtuvo una orden de registro y allanamiento contra el vehículo Chevrolet Impala color gris, la cual fue diligenciada el 27 de junio de 2021. Continuó relatando que, mediante dicho registro se ocuparon dos armas de fuego de 9mm y un arma de fuego de 40mm. La Agente Candelaria, testificó que el 9 de julio de 2021 colocó bajo arresto a Freddy Cancel González por los hechos ocurridos en Monte Isleño en Mayagüez. Relató que, al inicio Freddy

Cancel González se negó a contestar preguntas y luego se negó a participar en una rueda de detenidos, pero que el 15 de julio de 2021 este expresó que quería declarar sobre el asesinato en Monte Isleño en Mayagüez. La Agente Candelaria explicó que durante la declaración de Freddy Cancel González le mostró fotos de las armas de fuego ocupadas en el vehículo Chevrolet Impala color gris y este le indicó lo siguiente:

> Me identifica un arma de fuego [...] el me dice que esa arma de fuego se la compró a uno de los del corrillo de él, a John Soto, porque John Soto no tenia arma de fuego y se la compraron a él, que se la vendió un tal Choco y un tal c/p Sonny del residencial. [...] Y que esa arma de fuego estaba involucrada. Choco la había, este, utilizado para darle muerte al, al, al transgénero. [2]

El duodécimo testigo del Ministerio Público fue Freddy Cancel González (en adelante, el señor Cancel). En corte abierta, declaró que se pasaba en el residencial junto a Sonny y al señor Ferrer, quien era conocido como Choco. Indicó que, el señor Ferrer utilizaba una guagua Toyota Tacoma color blanca para ir a trabajar. Asimismo, el señor Cancel testificó que conocía a John Soto y era una de sus personas de confianza para estar en la calle. Continuó declarando que, le solicitó a Sonny que consiguiera una pistola para John porque estaba desarmado y quería comprársela.[3] Relató el señor Cancel que, como resultado de la referida solicitud, Sonny y el señor Ferrer fueron a su casa para venderle una pistola Glock 19. Específicamente, el señor Cancel declaró lo siguiente:

> **R:**    "Nah, este, ellos vinieron y me ofrecieron la, la 'dieci' ... la Glock 19, Choco la tenia en la cintura, Sonny tenía su pistola, y me la enseñaron, y yo le pregunté que si estaba sucia.
>
> **P:**    Ok. Usted dic que Choco tenía una pistola...
>
> **R:**    Si ...
>
> **P:**    ... ¿en dónde...
>
> **R:**    ...la Glock 19.
>
> **P:**    ...la tenía?
>
> **R:**    En la cintura.
>
> **P:**    En la cintura. Y, ¿Qué pistola fue la que le ofrecieron?

---

[2] Transcripción de Prueba Oral del día 14 de junio de 2023, pág. 459, línea 3-8.
[3] Transcripción de Prueba Oral del día 14 de junio de 2023, pág. 541.

**R:** Una Glock 19.

**P:** Y la tenía, ¿Quién?

**R:** Choco

**P:** Choco. Y, ¿qué paso con esa pistola que tenía Choco?

**R:** 'Nah', me, me la ensenaron y yo pregunte que si estaba sucia y ...

[...]

**P:** ¿A que usted se refería con que estaba sucia?

**R:** Si tenía muerte.

[...]

**P:** 'Aja'. Y, ¿qué le dijo Choco?

**R:** Que estaba sucia.

**P:** Y, ¿qué... 'Aja'. Que estaba sucia, ¿Por qué? Si... Si le dijo.

**R:** 'Nah', me dijo que, que con esa pistola había matado a el transgénero y me contó cómo fue que lo mató, Michellyn.

**P:** ¿Qué le dijo que... ¿Qué le dijo? ¿De qué forma... ¿Qué paso con Michellyn?

**R:** 'Nah' que el estaba en... que se lo llevo desde la ... desde el apartamento donde vivía en El Carmen, que se lo llevó en la guagua ... en la Tacoma y, y lo mató, y lo tiró por un monte.

**P:** Y, ¿con quién, si alguien, hizo eso?

**R:** No, no me dijo.

**P:** No le dijo. Y le pregunto, ¿qué pasó con el arma?

**R:** Lo compramos, se la compramos.

**P:** Se la... ¿En cuánto se la compraron?

**R:** Mil doscientos (1,200). [4]

El señor Cancel testificó que conocía a Michellyn del caserío El Carmen y de la tienda del Gordo, en la cual también frecuentaba el señor Ferrer.[5] Además, indicó que el 9 de mayo de 2021 se cortó el grillete, el cual tenía por un caso de armas, debido a que tirotearon su casa. Sostuvo que, por lo anterior, se fue para Rincón en compañía con otras personas y explicó que utilizaban un vehículo Chevrolet Impala color gris. Asimismo, el señor Cancel señaló que un día llegaron a la residencia en Rincón en la cual se encontraba la Policía y, al intentar

---

[4] Transcripción de Prueba Oral del día 14 de junio de 2023, págs. 543-546.
[5] Transcripción de Prueba Oral del día 14 de junio de 2023, págs. 548 y 557.

retroceder, el vehículo se cayó por un barranco. Explicó que, durante tal suceso, él estaba como pasajero en el vehículo, John era el conductor y en la parte posterior estaban Rasta y Loíza. A su vez, el señor Cancel añadió que él llevaba consigo un arma *"19 cuarta con accesorios de quinta"*, John tenía "la Glock 19", Rasta tenía una *"40 Smith & Wesson con dos peines"* y Loíza tenía una *"Glock 17".*[6] Indicó, además, que Rasta fue el único que se quedó "pinchao" en el vehículo y todos los demás lograron salir.

El decimocuarto testigo del Ministerio Publico era Minnelly Hernández Huertas (en adelante, la señora Hernández). Durante el juicio, testificó que era examinadora de armas de fuego del Instituto de Ciencias Forenses (en adelante, ICF). Añadió que, el 8 de octubre de 2020, el Agente Acevedo entregó al ICF tres (3) casquillos relacionados al asesinato ocurrido en San German el 30 de septiembre de 2020 e indicó que le asignó número AF200059 para una comparación microscópica.[7] Además, sostuvo que el 21 de julio de 2021 la evidencia anterior fue resometida por el Agente Acevedo y se le asignó el número AF211012 para examen de casquillo, examen microscópico y examen de comparación microscópica con el caso AF210897.[8] Explicó la señora Hernández que el caso AF210897 contenía la evidencia de una pistola marca Glock, modelo 19, calibre 9 milímetros con el número de serie TEG306.[9]  La señora Hernández declaró sobre los resultados de los exámenes antes descritos, lo siguiente:

> **P:**     Y, ¿cuáles fueron los resultados del examen que usted le hizo a esos tres (3) casquillos que se le había solicitado que fueran comparados con el AF210897?
>
> **R:**     Esos resultados se colocaron en, en el numero 2, que entonces indican que los casquillos de bala marcados del E1 al E3 descritos en la pieza 11 del caso A 'ven' … AF200959 re sometido bajo el caso AF211012, que corresponde a la pieza 20, en ese caso, son calibre 9 milímetros y fueron disparados por la pistola descrita en la pieza 3 del caso AF210897. [10]

---

[6] Transcripción de Prueba Oral del día 14 de junio de 2023, págs. 555-557.
[7] Transcripción de Prueba Oral del día 15 de junio de 2023, págs. 696-698.
[8] Transcripción de Prueba Oral del día 15 de junio de 2023, págs. 714-715, 728.
[9] Transcripción de Prueba Oral del día 15 de junio de 2023, págs. 722-724.
[10] Transcripción de Prueba Oral del día 15 de junio de 2023, pág. 728.

El decimoquinto testigo del Ministerio Público era el Agente José Acevedo Olivencia (en adelante, Agente Acevedo). En corte abierta, declaró que el 30 de septiembre de 2020 tomó servicio en la carretera 114, km. 10.2, a la entrada de la Finca La Providencia en la jurisdicción de San Germán debido a la muerte de Daniel Ramos Vargas. Continuó testificando que, en el área de los hechos, se localizaron tres (3) casquillos de bala disparados, calibre nueve (9) milímetros, los cuales fueron marcados, fotografiados, embalados y sometidos a la sección de balística del ICF.[11] Añadió que, en la escena, se encontraba presente el señor Ramos, el hermano del occiso, quien le indicó que este último era transgénero y que residía en el residencial Del Carmen en Mayagüez. Además, expresó que inició una investigación contra el señor Ferrer por los hechos ocurridos el 30 de septiembre de 2020, debido a una carta que se recibió el 23 de marzo de 2021 en la Comandancia de la Policía sin destinatario a modo de confidencia y a nombre de un remitente que no redactó la misma.[12] Por lo anterior, el Agente Acevedo localizó al señor Ferrer en Las Cucharas en Ponce y, el 14 de julio de 2021, lo entrevistó. Explicó que, tras hacerle las advertencias de ley como sospechoso en el caso, el señor Ferrer le expresó lo siguiente:

> **P:**     ¿Qué información, si algún a, le dio el señor Osvaldo Ferrer Martínez luego de que usted le hiciera advertencias para sospechoso?
>
> **R:**     El me brindó, eh, eh, sus datos personales y a preguntas de este servidor, este me informó que, que, él, eh, conocía… que el 'co' … conocía a, a Daniel Ramos, a Michellyn, que la conocía del, del residencial y que él, eh, a preguntas mías, que el utilizaba una guagua Tacoma, color blanca, que era de su trabajo…
>
> […]
>
> **R:**     eh, me brindó esa información y en 'ad' … y después el me indico que no… que no iba a hablar del asesinato de… del joven 'Michelle' … Michellyn porque no, no 'sabían' 'nah' y no iba a hablar nada más.[13]

---

[11] Transcripción de Prueba Oral del día 16 de junio de 2023, pág. 774.
[12] Transcripción de Prueba Oral del día 16 de junio de 2023, págs. 813-835
[13] Transcripción de Prueba Oral del día 16 de junio de 2023, pág. 842

El Agente Acevedo también testificó que debido a la información que le brindó la Agente Candelaria, entrevistó al señor Cancel el 15 de junio de 2021 y que este le expresó lo siguiente:

**P:**     ¿Qué información le dio el señor Freddy Cancel González?

**R:**     Él me informa que, que para ese momento él estaba 'engrilletao', como el menciona, por un caso de Ley de Armas que se había cogido, eh, que estaba en su residencia, en el residencial Candelaria, y que, eh, él y John Soto estaban buscando un arma de fuego para, para John Soto, porque el estaba armado, pero, John Soto no estaba armado. Que, por el lugar frente a Candelaria, en el edificio donde él reside pasó Sonny y él le reclamó y le pidió, le solicitó, verdad, que necesitaba un arma de fuego para John Soto, que si sabía de algo y entonces Sonny le manifestó que Choco, como le dicen a Osvaldo Ferrer Martínez, tenía una para la venta. Entonces, que posteriormente a eso, eh, se persona Sonny con Choco, eh, llegan armados, Choco llega armado con la pistola 9 milímetros, modelo 9, Glock, color negra, se la enseña, a, a 'ca' ... a Freddy Cancel, Freddy Cancel la chequea, la verifica, verdad, la coge, la verifica, le pregunta si esa ... si esa pistola esta 'caga', como él menciona en el bajo mundo, si esta clara, si no esta sucia, si no tiene muerte, y el, le, le, le manifestó que, que sí, que estaba sucia porque con esa le, le había 'dao' 'pa' bajo a, a... habían matado a, a Michellyn, que lo había sacado de su apartamento, que se lo había llevado en la Tacoma blanca, para un monte, y que le había 'dao' 'pa' bajo. Con todo y eso, eh, 'co' ... hicieron el negocio, compraron el arma de fuego por un costo de mil doscientos dolares ($1,200.00), y entonces posteriormente a eso, pues, el...[14]

Debido a lo anterior, el Agente Acevedo indicó que solicitó al ICF que analizaran *vis a vis* los tres casquillos de bala disparados, calibre nueve (9) milímetros, recolectados en la carretera 114, km. 11.2 en la entrada de la Finca La Providencia en San Germán con la pistola, nueve (9) milímetros, modelo 19, color negra, número de serie TEG306 que entregó la Agente Candelaria como resultado de un procedimiento bajo su cargo.[15]   El Agente Acevedo indicó lo siguiente:

**P:**     Y le pregunto, esa pistola, ¿qué paso con esa pistola?

**R:**     Esa pistola fue analizada en el Instituto de Ciencias Forenses y esta pistola 'hitio' con tres (3) casquillos de bala disparados en la escena donde ultitmaron al señor 'Michelly', Daniel Ramos Vargas, y esa era la pistola que, que el señor Osvaldo Ferrer Martínez le vendió a Freddy Cancel 'guz' ... González y a John Soto.[16]

Sometido el caso por parte del Ministerio Publico, la Defensa presentó su prueba testifical y, a continuación, incluimos un resumen.

---

[14] Transcripción de Prueba Oral del día 16 de junio de 2023, págs. 849-850.
[15] Transcripción de Prueba Oral del día 16 de junio de 2023, págs. 853-857.
[16] Transcripción de Prueba Oral del día 16 de junio de 2023, pág. 859.

El primer testigo de la Defensa fue Janice Torres Torres (en adelante, señora Torres). En su examen directo, expresó que funge como gerente de operaciones de Costa del Fuego Enterprise Corp., en la cual el señor Ferrer fue empleado desde 2019 hasta 2021. Continuó declarando que el señor Ferrer y Carlos Reyes Ortiz trabajaban juntos, siendo este último supervisor del primero. La señora Torres añadió que la guagua Toyota Tacoma era utilizada por Carlos Reyes Ortiz, no obstante, sostuvo que no tenía conocimiento de lo que sucedía luego que se llevaba la guagua. Además, testificó que la compañía no contaba con ponchador que hiciera constar la hora de entrada y salida laboral de sus empleados, sino que dependían de la buena fe de estos.

El segundo testigo de la Defensa fue Carlos Reyes Ortiz (en adelante, el señor Reyes). Reconoció que era empleado de Costa del Fuego Enterprise Corp. donde fungía el puesto de supervisor. Asimismo, el señor Reyes sustentó que era la persona a cargo de la guagua Toyota Tacoma la cual utilizaba para recoger a los empleados bajo su supervisión. Además, declaró que el 30 de septiembre de 2023 estaba trabajando en el proyecto Ponce Eye en Ponce junto al señor Ferrer y otros empleados.[17] Específicamente sostuvo que recogió los empleados, incluyendo al señor Ferrer, a las 7:00 a.m. y empezaron a trabajar a las 8:00 a.m. terminando así a las 6:00 p.m.[18] El señor Reyes recalcó que lo anterior quedaba constatado en la hoja de nómina que el mismo preparaba y le entregaba a la señora Torres.[19]

Sometida la prueba tanto del Ministerio Publico como de la Defensa, el 22 de junio de 2023, el foro primario encontró culpable al apelante por los delitos imputados. El 18 de agosto de 2023, el TPI sentenció al señor Ferrer a una pena de 141 años de reclusión la cual debe ser cumplida de manera consecutiva de la siguiente forma: (a) 99 años por el Artículo 93 del Código Penal, *supra;* (b) 20 años por el

---

[17] Transcripción de Prueba Oral del día 22 de junio de 2023, págs. 1053-1056.
[18] Íd.
[19] Íd.

Artículo 6.05 de la Ley de Armas, *supra*; (c) 10 años por el Artículo 6.14 de la Ley de Armas, *supra*; y (d) 12 años por el Artículo 6.22 de la Ley de Armas, *supra.*

Inconforme, el 13 de septiembre de 2023, el señor Ferrer acudió ante esta Curia mediante *Apelación Criminal* y señaló la comisión de los siguientes errores:

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD EN TODOS U CADA UNA DE LAS ACUSACIONES PRESENTADAS, ANTE UNA PRUEBA QUE NO DERROTÓ LA PRESUNCION DE INOCENCIA Y NO ESTABLECIÓ LOS ELEMENTOS DE LOS DELITOS MÁS ALLÁ DE DUDA RAZONABLE.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD A PESAR DE QUE LA ÚNICA PRUEBA QUE TUVO ANTE SU CONSIDERACIÓN QUE IDENTIFICARA Y CONECTARA AL ACUSADO CON LOS HECHOS DELICTIVOS FUE UNA ALEGADA ADMISIÓN A UN PARTICULAR QUE NO FUE CORROBORADA EN CLARO INCUMPLIMIENTO CON NUESTRO ORDENAMIENTO JURÍDICO.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD EN CONTRA DEL AQUÍ APELANTE CUANDO LA PRUEBA DE IDENTIFICACIÓN Y CONEXIÓN DEL ACUSADO CON EL HECHO DELICTIVO DESCANSO EN PRUEBA DE REFERENCIA Y EN EL TESTIMONIO MENDAZ DE UN TESTIGO PARCIALIZADO Y CON INTERÉS.

En atención a ello, el 29 de septiembre de 2023, emitimos una *Resolución* concediendo término para presentar la Transcripción de Prueba Oral.

Tras la concesión de varias prórrogas, el 18 de marzo de 2023, el apelante presentó *la Transcripción de Prueba Oral* estipulada por ambas partes.

Así las cosas, el 8 de abril de 2023, el apelante presentó su *Alegato Suplementario.*

En consecuencia, el 23 de mayo de 2024, el Pueblo de Puerto Rico presentó su *Alegato* en oposición a la apelación.

Con el beneficio de la comparecencia de las partes y la transcripción estipulada de la prueba oral, procedemos a resolver.

## II.

### A. Presunción de inocencia y la duda razonable

La Constitución de Puerto Rico garantiza a toda persona acusada de delito el derecho fundamental a la presunción de inocencia. CONST. PR, art. II, § 11. *Pueblo v. Resto Laureano*, 206 DPR 963, 967 (2021). *Pueblo v. De Jesús Mercado*, 188 DPR 467, 475 (2013). Además, la Regla 304 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 304 (1), ha incorporado este imperativo constitucional. Asimismo, la Regla 110 Procedimiento Criminal, 34 LPRA Ap. II, R. 110, reitera el precitado derecho fundamental: "[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. [...]". A su vez, dicha norma constituye uno de los imperativos del debido proceso de ley al exigir que una persona acusada en un proceso criminal se presuma inocente, mientras no se demuestre lo contrario. *Pueblo v. Irizarry*, 156 DPR 780, 786 (2002). *Pueblo v. León Martínez*, 132 DPR 746, 764 (1993). Para rebatir tal presunción, nuestro ordenamiento requiere que el Estado establezca la culpabilidad una persona imputada de delito más allá de duda razonable. *Pueblo v. Arlequín Vélez*, 204 DPR 117, 146 (2020). *Pueblo v. Toro Martínez*, 200 DPR 834, 855-56 (2018). *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986). En otras palabras, se exige un *quantum* probatorio de más allá de duda razonable para controvertir la presunción de inocencia. *Pueblo v. Santiago*, 176 DPR 133, 142 (2009).

El concepto de "duda razonable" implica necesariamente aquella que produce insatisfacción o intranquilidad en la conciencia del juzgador respecto a la evidencia presentada en el caso. *Pueblo v. Irizarry, supra*, pág. 788. Sobre este requisito, el Tribunal Supremo ha expresado que:

> El Ministerio Fiscal no cumple con ese requisito presentando prueba que meramente sea "suficiente", esto es, que "verse" sobre todos los elementos del delito imputado; se le requiere que la misma sea "suficiente en derecho". Ello significa que la evidencia presentada, "además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia

exenta de preocupación" o en un ánimo no prevenido [...] Esa "insatisfacción" con la prueba es lo que se conoce como "duda razonable y fundada". *Pueblo v. De Jesús Mercado, supra*, pág. 476, citando a *Pueblo v. Cabán Torres,* 117 DPR 645 (1986).

Por lo tanto, el *quantum de más allá de duda razonable* aplica para "cada uno de los elementos del delito, la conexión de estos con el acusado y la intención o negligencia de éste". *Íd., Pueblo v. Santiago, supra.* Cabe destacar que nuestro más Alto Foro ha expresado que:

> La determinación de que cierta prueba es suficiente para demostrar la culpabilidad del acusado más allá de duda razonable es una cuestión de raciocinio, producto de un análisis de todos los elementos de juicio del caso y no una mera duda especulativa o imaginaria. *Pueblo v. De Jesús Mercado, supra,* pág. 475-76.

## B. Prueba de referencia

La Regla 801(c) de Evidencia, 32 LPRA Ap. VI, R.801, define prueba de referencia como una declaración que no sea la que la persona declarante hace en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado. Por su parte, la Regla 804 de Evidencia, 32 LPRA Ap. VI, R.804, dispone que "salvo que de otra manera se disponga por ley, no será admisible prueba de referencia, sino de conformidad con lo dispuesto en este capítulo. Esta regla se denominará Regla de prueba de referencia."

Cuando se pretende utilizar prueba de referencia contra un acusado, se activa la protección constitucional del derecho a confrontación consagrado tanto en la Enmienda Sexta de la Constitución de los Estados Unidos, como en la Sección 11 de nuestra Constitución. Dicha protección constitucional no sólo garantiza el derecho al careo, sino que también implica que cierta prueba de referencia, si es testimonial, también será excluida a pesar de caer bajo alguna de las excepciones a la regla de exclusión codificadas en las Reglas de Evidencia. *Crawford v. Washington*, 541 US 36 (2004), *Pueblo v. Guerrido López,* 179 DPR 950 (2010). En esencia, la Corte Suprema federal determinó que la cláusula de confrontación sólo se activa en relación con declaraciones testimoniales, tanto para testimonios hechos en corte, como para declaraciones realizadas fuera del tribunal si: (1) el

declarante no está disponible para comparecer al juicio y (2) el acusado tuvo la oportunidad de contrainterrogar al declarante en el momento en que se hizo la declaración. Si no se satisfacen estos requisitos, la declaración sería prueba de referencia inadmisible contra el acusado, independientemente de que satisfaga alguna excepción de las dispuestas en las Reglas de Evidencia. *Crawford v. Washington, supra; Pueblo v. Santos Santos*, 185 DPR 705, 720-722 (2012).

**C. Admisión y corroboración**

El concepto *"admisión"* se refiere a aquellas manifestaciones sobre un hecho específico o sobre algún elemento del delito, mientras que el concepto de *"confesión"* se refiere a la manifestación de que se cometió el delito, haciendo referencia a todos los elementos del delito. D. Nevares-Muñiz, *Sumario de Derecho Procesal Penal Puertorriqueño*, 8va ed., San Juan, Inst. para el Desarrollo del Derecho, 2007, pág. 35.

De manera que las admisiones o confesiones extrajudiciales de un acusado sobre su culpa o actos delictivos pueden, conforme a las Reglas de Evidencia, ser presentadas durante el juicio mediante el testimonio de un testigo declarante como excepción a la regla de prueba de referencia. 32 LPRA 32 LPRA Ap. VI, R. 803. Sin embargo, para que se logre una convicción apoyada en ello, se requiere que el testimonio sea corroborado por otra evidencia. *Pueblo v. Campos Suárez*, 86 DPR 310, 313-315 (1962); *Opper v. United States*, 348 US 84, 89-93(1954*); Smith v. United States*, 348 US 147, 201 (1954).

Con relación a la admisibilidad en el juicio de una confesión o admisión extrajudicial, operará la doctrina de corroboración del *corpus delicti. Pueblo v. Fradera Olmo*, 122 DPR 67, 73 (1988). Conforme a la misma, será necesario que el Ministerio Público corrobore, con prueba independiente, la certeza de las referidas confesiones o admisiones. *Pueblo v. Delgado Ramírez*, 128 DPR 721, 724 (1991). El propósito de dicha doctrina es que un acusado no sea sentenciado en virtud de confesiones o admisiones falsas. *Pueblo v. Fradera Olmo, supra*, pág. 73.

A través del desarrollo de la referida doctrina, se estableció que "[l]a evidencia de corroboración no tiene que ser suficiente, independientemente de las admisiones o manifestaciones para establecer el *corpus delicti*; es suficiente si la evidencia de corroboración tiende a sostener los elementos esenciales admitidos por el acusado en forma tal que justifique la determinación de su veracidad por un jurado". *Pueblo v. Campos Suárez, supra*, pág. 311 citando a *Martínez v. United States*, 295 F.2d 426 (10mo. Cir. 1961). Además, el Tribunal Supremo reiteró que:

> [...] no era necesario que la evidencia corroborativa estableciera la culpabilidad del acusado fuera de toda duda razonable; que evidencia circunstancial podría ser suficiente corroboración; y que cuando hay alguna evidencia aliunde tendiente a establecer el corpus delicti, la admisión podría ser considerada en relación con esa evidencia para establecer el corpus delicti. [...] *Pueblo v. Fradera Olmo, supra*, pág. 74.

Cabe mencionar que, al atender confesiones extrajudiciales, el juez es quien determina preliminarmente la admisibilidad de estas, conforme dispone la Regla 109(C) de las Reglas de Evidencia, 32 LPRA Ap. IV, R. 109(C). De ser admitida, "el acusado podrá presentar al jurado y el ministerio público refutar evidencia pertinente relativa al peso y credibilidad de la confesión y las circunstancias bajo las cuales la confesión fue obtenida". *Íd.* Entonces pues, el juzgador de los hechos deberá otorgarle o no validez y confiabilidad a dicha confesión. *Íd.*

**D. Apreciación de la prueba**

Como es sabido, la apreciación de la prueba que realiza el TPI en el ejercicio de su sana discreción está revestido de confiabilidad y merece nuestro respeto y deferencia. *Argüello v. Argüello,* 155 DPR 62, 79 (2001) citando a *Pueblo v. Bonilla Romero,* 120 DPR 92, 111 (1987). En vista de lo anterior, la valoración que lleva a cabo el foro primario se presume correcta, toda vez que es este quien tiene la oportunidad de ver, escuchar y valorar las declaraciones de los testigos, así como sus lenguajes no verbales. *Pueblo v. Santiago,* 176 DPR 133, 148 (2009); *Pueblo v. Acevedo Estrada,* 150 DPR 84, 99 (2000).

[...] no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación. *Pueblo v. Toro Martínez, supra*, pág. 857, citando a *Ortiz v. Cruz Pabón*, 103 DPR 939, 947 (1995).

A esos efectos, el Tribunal Supremo de Puerto Rico ha resuelto que **un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto**. *Coop. Seguros Múltiples de P.R. v. Lugo*, 136 DPR 203, 208 (1994) (Énfasis suplido).

En consecuencia, este Tribunal Apelativo no debe intervenir con las determinaciones de hechos, con la apreciación de la prueba ni con la adjudicación de credibilidad efectuadas por el mismo, excepto en aquellas situaciones en que se demuestre que este último: (i) actuó con prejuicio o parcialidad, (ii) incurrió en un craso abuso de discreción, o (iii) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo. *Pueblo v. Irizarry, supra*, pág. 789; *Pueblo v. Maisonave*, 129 DPR 49, 62-63 (1991). De igual forma, se podrá intervenir con la determinación del TPI cuando la referida valoración se aparte de la realidad fáctica o resulte inherentemente imposible o increíble. *Pueblo v. Martínez Landrón*, 202 DPR 409, 424 (2019) citando a *Pueblo v. Maisonave, supra*, pág. 63. De manera que, este Tribunal solo podrá intervenir con la apreciación del foro juzgador si, luego de evaluar minuciosamente la prueba del caso, guardamos serias, razonables y fundadas dudas acerca de la culpabilidad del acusado. *Pueblo v. Casillas, Torres*, 190 DPR 398, 415-417 (2014).

En resumen, este estándar de revisión limita nuestra facultad revisora para sustituir el criterio del foro primario, en aquellos casos en que de la prueba admitida no apoye la determinación del foro

sentenciador. Ahora bien, la determinación de adjudicación de credibilidad no es un asunto que se resuelve a base de la cantidad de los testigos presentados. De hecho, es norma reiterada que nuestro sistema probatorio no requiere la presentación de un número específico de testigos para probar la culpabilidad de un acusado más allá de duda razonable. *Pueblo v. Toro Martínez, supra.* Al contrario, se ha resuelto que:

> "[…] el testimonio de un testigo principal, por sí solo, de ser creído, es suficiente en derecho para sostener un fallo condenatorio, aun cuando no haya sido un testimonio "perfecto", pues, "[e]s al juzgador de los hechos a quien le corresponde resolver la credibilidad de un testigo cuando haya partes de su testimonio que no sean aceptables […]". *Íd,* citando a *Pueblo v. De Jesús Mercado, supra,* 476-477 (2013); *Pueblo v. Chévere Heredia,* 139 DPR 1, 15-16 (1995).

Cónsono con lo anterior, en *Pueblo v. Cabán Torres, supra,* el Tribunal Supremo expresó que:

> "cuando un testigo se contradice, lo que se pone en juego es su credibilidad y es al jurado o al juez de instancia a quien corresponde resolver el valor de su restante testimonio". *Pueblo v. Caban Torres, supra,* págs. 656-657.

### III.

Por estar relacionados, procedemos a analizar los tres señalamientos de error del apelante de manera conjunta. En síntesis, el apelante sostiene que el foro primario erró al determinar que era culpable de todos los delitos imputados, pues no se demostró su culpabilidad más allá de duda razonable ni se derrotó la presunción de inocencia. Alega, además, que la única prueba del Ministerio Público que establece conexión con la conducta delictiva es el testimonio del señor Cancel, el cual era prueba de referencia, parcializada y mendaz. Adujo, también, que se había incumplido con el requisito de corroboración de la presunta admisión realizada por el señor Ferrer. No tiene razón.

De la *Transcripción de la Prueba Oral* surge que el señor Cancel le indicó a la Agente Candelaria que el apelante era responsable de la muerte de Daniel Ramos Vargas. Al así proceder, el señor Cancel le brindó ciertos detalles a la Agente Candelaria, y posteriormente al

Agente Acevedo, que fueron corroborados con evidencia independiente. Veamos.

Durante el juicio en su fondo, el señor Cancel declaró que, al momento de realizar una compraventa de un arma de fuego, el apelante le dijo que se llevó a Daniel Ramos Vargas de su apartamento en el residencial El Carmen en la guagua Tacoma, que lo mató con la Glock 19 y lo tiró por un monte. Lo anterior fue corroborado de varias maneras. Primero, surge del propio testimonio del señor Cancel, el señor Ramos y el Agente Acevedo que el occiso residía en el residencial El Carmen en Mayagüez. Segundo, tanto el señor Ramos y el Agente Acevedo testificaron que el 30 de septiembre de 2020 el apartamento del occiso estaba cerrado, con enseres electrodomésticos encendidos y con sus pertenencias personales. Tercero, consta de los testimonios del Agente Ortiz, el señor Ramos y el Agente Acevedo que, el 30 de septiembre de 2020, el cuerpo del occiso fue hallado en la carretera 114, km 10.2 en San Germán cerca de una finca llamada La Providencia. Cuarto, la examinadora de armas del ICF indicó que el resultado del examen de comparación microscópica arrojó que los tres (3) casquillos de bala, calibre 9 milímetros, localizados en la escena del crimen de autos en San Germán fueron disparados por la pistola marca Glock, modelo 19, calibre 9 milímetros con el número de serie TEG306 incautada en Rincón, la cual estaba vinculada con el crimen perpetuado en Monte Isleño en Mayagüez.

Contrario a lo esbozado por el apelante, la determinación del foro primario no descanso únicamente en el testimonio del señor Cancel, sino que en el conglomerado de toda la prueba desfilada en el juicio. Ciertamente, conforme a lo resuelto en el citado caso de *Pueblo v. Fradera Olmo, supra,* la prueba antes descrita tiende a corroborar o sostener elementos esenciales admitidos por el apelante en la confesión, tales como que este se había llevado al occiso "desde su apartamento donde vivía en El Carmen" y que después "lo mató y lo tiró por un monte". A luz de la prueba de corroboración presentada, podemos inferir

la veracidad del testimonio del señor Cancel y la confesión que el propio apelante le hizo a este.

En el caso de autos el foro primario evaluó el testimonio del señor Cancel y la prueba independiente presentada y entendió que esta cumplía con el requisito de corroboración del *corpus delicti*. Además, conforme a derecho, el testimonio de una persona, por sí solo, a quien el juzgador de los hechos merezca entero crédito, es prueba suficiente en derecho para sostener el fallo condenatorio. Regla 110 (d) de Evidencia, *supra*. Puesto que el Tribunal Supremo ha reiterado que el foro primario es quien está en mejor posición para aquilatar la prueba ante su consideración y, por ende, tal apreciación merece gran respeto y deferencia.

Por todo lo cual, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, nos abstenemos de intervenir con la apreciación de la prueba hecha por el TPI. No albergamos duda de que la prueba de cargo, creída por el foro primario, estableció más allá de duda razonable la comisión de los delitos tipificados en el Artículo 93(a) del Código Penal, *supra*, y los Artículos 6.05, 6.14 y 6.22 de la Ley de Armas, *supra.*, por el señor Ferrer.

Por último, concluimos que, en el caso autos, no corresponde hablar sobre prueba de referencia inadmisible debido a que el apelante tuvo la oportunidad de contrainterrogar a todos y a cada uno de los testigos de cargo presentados por el Ministerio Público conforme a las Reglas de Evidencia, *supra.*

Así evaluado el expediente ante nuestra consideración y la transcripción de prueba oral, resolvemos que corresponde Confirmar la determinación apelada.

**IV.**

Por los fundamentos expuestos, se confirma la *Sentencia* emitida el 18 de agosto de 2023, mediante la cual se condenó al señor Ferrer a una pena de 141 años de reclusión por los delitos tipificados en el

Artículo 93 (a) del Código Penal, supra y los Artículos 6.05, 6.14, 6.22 de la Ley de Armas, *supra.*

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones